IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

## STATE OF TENNESSEE v. CHARLES RAY POWELL

**Direct Appeal from the Circuit Court for Franklin County**
**No. 01C01-9806-CC-00260     Honorable Thomas W. Graham, Trial Judge**

_____

**No. M1998-00757-CCA-R3-CD - Decided May 12, 2000**
**No 10667**
_____

The defendant, after a jury trial, was convicted of first degree murder and sentenced to life. The evidence is sufficient to support the conviction. The trial court did not err in refusing to charge the jury on post-traumatic stress disorder. The self-incriminating statements of the defendant were admissible. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3, Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAMS, J. delivered the opinion of the court, in which TIPTON and WITT, JJ. joined.

Jack B. Lowery, Lebanon, Tennessee, and Peter Strianse, Nashville, Tennessee, for the appellant, Charles Ray Powell.

Paul G. Summers, Attorney General and Reporter, Marvin E. Clements, Jr., Assistant Attorney General, James Michael Taylor, District Attorney General, and Steven M. Blount, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Charles Ray Powell, appeals from his Franklin County jury conviction of first degree murder, a class A felony. The defendant was sentenced to life in the Department of Correction. In this appeal, the defendant argues that:
  (1) Insufficient evidence exists to support a conviction of first degree murder;
  (2) the trial court erred in allowing into evidence the involuntary statements of the defendant; and
  (3) the trial court erred in refusing to charge the jury on post-traumatic stress disorder.
After careful review of the briefs, the record, and the applicable law, we affirm the judgment of the trial court.

## BACKGROUND

The defendant was convicted of shooting and killing Roger Parker, a neighbor in a rural area of Franklin County. This offense occurred on March 17, 1995, prior to the July 1995 amendment to the first degree murder statute.

### The Pretrial Hearing

On October 29, 1996, the trial court conducted a hearing on the defendant's motion to suppress various evidence, including two oral statements from the crime scene and a tape-recorded statement given at the police department. Several witnesses testified for the state regarding the arrest and investigation.

The testimony established that officers from various agencies responded to a mutual aid radio request regarding a shooting at the victim's residence. Decherd Police Officer Tommy Brazelton[1] testified that he was the first officer on the scene. When the defendant appeared from behind a tree, Brazelton said that he drew a weapon on the defendant and ordered him to raise his hands and to approach Brazelton's position. The defendant complied and told Brazelton that he had killed Parker. The defendant walked under his own power and, despite somewhat slurred speech, appeared neither disoriented nor confused. Franklin County Deputy Ken Elliott handcuffed the defendant, and the officers secured him in a patrol car.

Brazelton retrieved a rifle from the general area where he saw the defendant and then entered the Parker residence with Decherd Police Chief David Throneberry. On leaving the residence, he first saw Franklin County Deputy Robert Campbell at the scene. Also, Brazelton said that Throneberry advised the defendant of his rights after the officers exited the residence.

Approximately ten minutes after Brazelton observed Franklin County Investigator Keith Henshaw speaking with the defendant, the defendant partially escaped from his restraints and began striking the window of the patrol car. An officer on the scene "maced" the defendant,[2] who was resecured before transport from the scene.

Throneberry testified that when he arrived on the scene Brazelton and Elliott were handcuffing the defendant. The defendant recognized Throneberry and told him that he did not

---

[1] Brazelton apparently worked for the Winchester Police Department on the hearing date. In this opinion, however, all officers will be identified by their respective departments on the date of the offense.

[2] "Maced" refers to a person's being sprayed with a chemical irritant.

belong there.[3]   After the defendant was secured in a patrol car, Throneberry advised him of his Miranda rights and then assisted in securing the Parker residence. Like Brazelton, Throneberry did not see Deputy Campbell until he left the house.

Campbell testified that he arrived on the scene and saw the defendant, covered with blood, standing with Brazelton beside a patrol car. He did not recall if the defendant was handcuffed, and he approached the defendant and asked what happened. The defendant replied that he had shot the victim. Campbell said, "Who?," and the defendant responded, "Roger Parker." Campbell said that when he arrived on the scene he only knew that a shooting at the victim's residence, involving the defendant, had been reported. He also testified that he arrived on the scene before Henshaw.

Henshaw testified that he advised the defendant, secured in the rear passenger compartment of a patrol car, of his Miranda rights. After the defendant acknowledged his understanding of the warning, he told Henshaw that he struck the victim with his rifle and then killed him because the victim had "been messing" with him.

Henshaw said that the defendant spoke clearly during their dialogue in the patrol car. He did not know if the defendant was drunk, but "he seemed to be pretty upset and pretty verbal as far as talking about it."

Tennessee Bureau of Investigation Special Agent Larry Davis testified that he interviewed the defendant after transport to the Franklin County jail and recorded a statement from him. Davis said that the defendant was upset and very angry with the officer who maced him. The defendant did not know Davis personally but told him that he knew who he was and that he hunted with his brother.[4]

The defendant also testified at the hearing. He said that he served in the Vietnam conflict and was drawing one hundred percent total permanent disability from the service. He also said that he had been a regular patient at the Veteran's Hospital in Murfreesboro, Tennessee for at least nineteen years. He denied giving any statement to Davis or even seeing him at the jail. He recalled neither speaking with Brazelton nor speaking with, or even seeing, Campbell at the scene. He only remembered his eyes burning from mace while being driven from the Parker residence and his realizing that he was in jail after approximately one and one-half months in custody.

The defendant's argument at the hearing relied on inconsistencies in accounts of the crime scene: If Brazelton accurately testified that Throneberry gave Miranda warnings after they exited the house and the defendant was secured in the car, then Campbell likely questioned the defendant,

---

[3]  Apparently, this statement referred to the defendant's belief that Throneberry was outside his jurisdiction.

[4]  Special Agent Davis testified that the defendant was correct: Davis' brother had hunted with the defendant.

who was outside the patrol car, before he was advised of his Miranda rights. The trial court found that the testimony sufficiently established that the defendant received Miranda warnings before giving anything other than voluntary and spontaneous statements. The trial court further concluded that any issue was essentially one of credibility, regarding contradictory versions of the proceedings at the scene, and was a jury question. Further, the trial court accredited testimony that the defendant was not so intoxicated as to have involuntarily waived his rights. The trial court stated that it would review the taped statement, as requested by the defendant, for proof of the defendant's intoxicated state. That court denied the defendant's motion to suppress the statements.

## The Trial

The trial began October 30, 1996. The state did not enter the recorded statement, and the trial court advised the parties that it had reviewed the tape and would not suppress the oral statements.

The victim's eight-year old son testified that he answered a knock at the door on the morning of March 17, 1995. The defendant, holding a gun behind his back, asked for the father and told the son to go upstairs. The son heard arguing and then gun shots. The son began to pray as he heard his father scream and moan. He testified that he picked up the phone to call 911 but stopped when he heard the defendant say he would call 911. He then overheard the defendant say, "Let me take my knife and cut his heart out."

As the son fled the house, he saw the defendant sitting on the sofa in the living room. His father was motionless on the floor, lying on his side in a pool of blood in front of the defendant. The son saw no weapon around his father. In socked feet, the son jumped off the deck and ran through the woods to a gravel road. He ran a long way down the mountain on the gravel road before flagging down Roger Hammond, a neighbor.

Mr. Hammond and the son returned to the home where Mr. Hammond encountered the defendant. Mr. Hammond asked, "What is going on?" The defendant responded, "What's going on? I just killed Parker." Mr. Hammond saw so much blood that he knew that he could not help the victim. When the defendant started walking towards him, Mr. Hammond retreated to his truck. Mr. Hammond took the son to a neighbor's house, where he tended to sores on the child's feet and called the victim's wife.

Michael Gibson, acquainted with the defendant, testified that the defendant knew he was interested in locating and purchasing a certain type of rifle. On the day of the homicide, the defendant advised Gibson where such a weapon could be purchased and accompanied him to purchase it. That same day, the weapon, used by the defendant to slay Parker, disappeared from Gibson's residence.

Officers essentially reiterated their preliminary hearing testimony. However, Campbell testified that he did not remember if the defendant was in the patrol car or not when he asked him what had happened. Further, officers testified that the deceased was found on his back with a semi-

automatic weapon across his torso, with a finger in the triggerguard.

Also, Wayne Sanders, a Tennessee Wildlife Resource Agency officer absent from the hearing, testified that he arrived on the scene and assisted in securing the subject. At the scene, the defendant, covered in blood, recognized him and told him he respected him and his work and that Sanders did not need his weapon. The defendant then told him he killed the victim. Sanders testified that the defendant was not behaving abnormally. The defendant also claimed that he had been shot, but officers found no gunshot wound.

Medical expert testimony opined that the defendant suffered from alcohol dependency, Valium dependency, and the symptoms of post-traumatic stress disorder. One witness, Dr. Rodeya Farooque, did not believe that the defendant was insane at the time of the homicide but believed him incapable of forming the intent requisite for first degree murder.

## ANALYSIS

### Admission of the Defendant's Statements

The defendant alleges the trial court violated his constitutional rights against self-incrimination by allowing certain of his statements into evidence. The defendant alleges that he gave three statements to officers of the Franklin County Sheriff's Department:
> (1) An oral statement to Sheriff's Deputy Robert Campbell;
> (2) an oral statement to Sheriff's Investigator Keith Henshaw; and
> (3) a taped recorded statement at the police station.

After a suppression hearing, the trial court refused to suppress the two oral statements.

Under the Fifth and Fourteenth Amendments of the United States Constitution, statements taken by an officer from a defendant during custodial interrogation are inadmissible as evidence against that defendant "unless certain warnings are given to protect a person's privilege against self-incrimination." Miranda v. Arizona, 86 S. Ct. 1602, 1612 (1966). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody and otherwise deprived of his freedom of action in any significant way." Id. at 1612; State v. Smith, 868 S.W.2d 561, 570 (Tenn. 1993); State v. Cooper, 912 S.W.2d 756 (Tenn. Crim. App. 1995). Further, the Tennessee Supreme Court has interpreted Article 1, § 9 of the Tennessee Constitution as securing a higher degree of protection against self-incrimination than guaranteed by the Fifth Amendment of the United States Constitution through Miranda warnings.[5]  See State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992).

The defendant contends not only that the first statement was given absent a Miranda warning but also that this statement "tainted" his second oral statement and thereby precluded its admissibility

_____

[5]  That provision states "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself."

against him.  In State v. Smith, 834 S.W.2d 915, 919 (Tenn. 1992), the Tennessee Supreme Court recognized that earlier statements, given absent Miranda warnings, could weigh upon the defendant's mind and substantially contribute to his or her involuntarily waiving the rights after proper admission of Miranda on a subsequent interview.  Id. at 919.  Therefore, that Court held that under the extra protections of the Tennessee Constitution,  "extraction of an illegal, unwarranted confession from a defendant rates as a rebuttable presumption that a subsequent confession, even if preceded by proper Miranda warnings is tainted by the initial illegality."  Id. (emphasis in original).

Therefore, after extracting an improper incriminating statement from a defendant, the state must show that the subsequent confession was given freely and voluntarily "and that the constitutional right to be free from self-incrimination was not waived due solely to the psychological pressures resulting from giving the previous statement."  Id.  To determine the effect of the prior statement, courts should scrutinize the "totality of the circumstances surrounding the two confessions" in the context of nine factors.[6]  Id. at 919-20.

We are obligated to give great weight to the trial court's findings that the evidence indicated that Throneberry, one of the very first officers on the scene, promptly administered Miranda warnings when the defendant was secured in a patrol car and that these warnings were provided prior to any custodial interrogation.  That court further determined that slight discrepancies in testimony were understandable, given the nature of the call and the immediate scene, and that any consequence of alleged discrepancies would be a jury question.  A trial court's findings of fact have the weight of a jury verdict and are not overturned, absent a preponderance of evidence against them.  See State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999).   This Court reviews application of law to those facts de novo.  See id.  This Court may consider the entire record, including proof addressed at the subsequent trial, in determining whether the trial court appropriately denied a motion to suppress. See State v. Henning, 975 S.W.2d at 290 (Tenn. 1998).

Campbell testified that the defendant was with Brazelton when Campbell approached him. However, both Brazelton and Throneberry testified that they did not see Campbell until after the house was secured. Further, Brazelton entered the residence with Throneberry. Therefore, Campbell was unlikely to have questioned the defendant until after both officers exited the building. Further, Throneberry testified, at both the hearing and the trial, that he administered warnings to the defendant within minutes of his being secured in the patrol car, immediately after officers took him into custody.   We find no preponderance of evidence against the trial court's findings of fact.

The defendant further postulates that the influence of controlled substances prevented him from giving a knowing and voluntary waiver prior to the second contested statement. The defendant asserts that he was, during the second statement, restrained in handcuffs in the patrol car, covered with blood, intoxicated to the level .16 as established by lab reports, under the influence of a large quantity of drugs, "was crying and apparently agitated and frustrated by his confinement, and was surrounded by a bevy of police officers."  The defendant asserts that the totality of circumstances

---

[6]  For those factors, see Smith, 834 S.W.2d at 919-20.

precludes his ability to intelligently make a free and informed choice to waive his rights against self-incrimination.

A defendant's intoxication does not automatically preclude admissibility of his statements; rather, that defendant must be intoxicated such that his waiver could not be the product of a free mind and rational intellect. See Lane v. State, 239 S.W.2d (Tenn. Crim. App. 1979). The trial court's determinations regarding voluntariness of statements at the suppression hearing carry the weight of a jury verdict and are binding on this Court absent a preponderance of evidence in the record otherwise. See State v. Goforth, 678 S.W.2d 477, 479 (Tenn. Crim. App. 1984).

The evidence in the record does not preponderate against the trial court's finding that the defendant voluntarily waived his right against self-incrimination. The defendant moved under his own power, recognized various persons on sight, recognized the Special Agent by name, and drew an association between that agent and the agent's brother. He recognized Throneberry and indicated that the officer should not have been in that jurisdiction. He warned Davis that any water applied to him after being "maced" would merely aggravate his discomfort. The pertinent officers testified that he did not appear intoxicated. Although the blood tests established presence of intoxicants, we do not find the preponderance of evidence required to overturn the trial court's findings.

Even if this Court held that there was error associated with admission of either or both of the contested oral statements, that error would be harmless beyond a reasonable doubt. See Tenn. R. Crim. P. 52(a). The defendant made at least two admissions outside any custodial interrogation that he killed the victim, and these statements were admissible. See State v. Chambless, 682 S.W.2d 227 (Tenn. Crim. App. 1984) (addresses admissibility of statements to state agents in absence of Miranda warnings). These statements and other evidence, discussed later in our analysis, established the basis for a trier of fact to determine, beyond a reasonable doubt, that the defendant committed first degree murder.

### Sufficiency of Evidence

The defendant's sufficiency of evidence argument specifically asserts that the state failed to prove, beyond a reasonable doubt, the distinct elements of deliberation and of premeditation. When a defendant challenges a jury verdict by questioning the sufficiency of evidence supporting that verdict, this Court must determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). The appellant is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

The credibility of witnesses, the weight of their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the trier of fact. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1983). A jury

verdict for the state accredits the testimony of the state's witnesses and resolves all conflicts in favor of the state. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Moreover, a guilty verdict removes the presumption of innocence enjoyed by defendants at trial and replaces it with a presumption of guilt. See State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Thus, an appellant challenging the sufficiency of the evidence carries the burden of illustrating to this Court why the evidence is insufficient to support the verdict. See State v. Freeman, 943 S.W.2d 25, 29 (Tenn. Crim. App. 1996).

The defendant was convicted of "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). For a conviction of first degree murder, the offense must have been both premeditated and "deliberately, that is, with coolness and reflection." State v. Brown, 836 S.W.2d 530, 539 (Tenn. 1992). "[T]he necessary elements of first-degree murder may be shown by circumstantial evidence." Id. at 541. "Relevant circumstances" for evaluating state of mind include a deadly weapon used on an unarmed victim, weapons were procured to commit the killing, and, if appropriate, repeated shots to the victim. See id. at 541-42; see also State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998).

In State v. Kendricks, 947 S.W.2d 875 (Tenn. Crim. App. 1996), the defendant went to his wife's place of employment, calmly asked his wife to step outside, retrieved a rifle from his vehicle, and shot and killed her. See Kendricks, 947 S.W.2d at 878, 880. Similarly, in the instant case the defendant stole a firearm that he actually located for an acquaintance's purchase, went to the victim's home while concealing a weapon, ordered the boy upstairs, shot the victim in the chest with a high-powered rifle, stabbed him several times in the chest, and struck him with the rifle with such force that he broke fragments from the stock of the weapon. After these actions, the defendant remarked that he should cut out the victim's heart. As in Kendricks, the facts "certainly give rise to the inference that the defendant had thought about killing [the victim] and that he had done so while in a 'cool' state of mind." Id. at 880. Further, "[c]almness immediately after a killing may be evidence of a cool, dispassionate, premeditated murder." State v. West, 844 S.W.2d 144, 148 (Tenn. 1992). The victim's son's testimony established that the defendant was calm. Further, the record established that after the victim's body was seen by the son, but before the officer arrived, the body was moved and a rifle, belonging to the victim, was placed in the deceased victim's grasp. This evidences a calm state of mind. This issue is therefore without merit.

### Jury Instructions

The defendant asserts that the trial court erroneously refused to issue a jury instruction that specifically addressed post-traumatic stress disorder. The trial judge carries a positive duty to issue "a complete charge on the law applicable to the facts of a case." State v. Phipps, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994); see also State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990) (an accused has a constitutional right to a correct and complete charge of the law). A defendant is entitled to every issue of fact raised by the evidence and material to his defense submitted through proper instructions to the jury, as well as, upon request, an instruction "which outlines the defense theory of his case." Phipps, 883 S.W.2d at 149-50. However, this Court reviews contested jury

instructions in the context of the entire charge, and if those instructions as a whole correctly, fully, and fairly set forth the applicable law, then denial of a special instruction is not error. See id. at 142; see also State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987).

The defendant asserts that his mental condition precluded his possessing the requisite mental state for a first degree murder conviction. "[E]vidence . . . on an accused's mental state[] is admissible in Tennessee to negate the elements of specific intent, including premeditation and deliberation in a first-degree murder case." See Phipps, 883 S.W.2d at 149. The defendant entered evidence of his status as a veteran of the Vietnam conflict and of his extensive history of mental treatment. The issued instruction comprised a statement that:

[i]f you find from the evidence that the defendant's capacity to form a culpable mental state may have been affected, then you must determine beyond a reasonable doubt what the mental state of the defendant was at the time of the commission of which, if any offense, he is guilty.

In Phipps, the defendant relied on the theory that his post-traumatic stress disorder precluded his possessing requisite intent for first-degree murder; he did not assert insanity or any other affirmative defense. Id. at 150. The trial court instructed the jury that post-traumatic stress syndrome and major depression were not defenses to a criminal offense, an instruction which effectively precluded the jury from considering submitted testimony regarding his mental state, suggested the evidence was of no consequence, and removed an accepted defense theory from the jury's consideration. Id. at 149-51.

In contrast, we have reviewed the jury instructions applied in the instant case and found that they instruct the jury as to the charged offense, potential lesser offenses, and the mens rea required for conviction of each of these offenses. The instructions further define the insanity defense, intoxication, and self-defense, all asserted by the defendant in addition to the argument that his mental condition precluded his forming the requisite mens rea for first degree murder. Further, the instructions clearly stated that the jury "heard evidence that the defendant might have suffered from a mental disease or defect which could have affected his capacity to form the culpable mental state required to commit the offense in this case." In their totality, these instructions remove neither the theory of diminished capacity nor precluded evidence from the jury's consideration. The concerns that required reversal in Phipps are therefore not invoked. This issue is without merit.

## CONCLUSION

We affirm the trial court's judgment.