STATE of Tennessee, Plaintiff–Appellee,

v.

Hosie Van SMITH, Defendant–Appellant.

Supreme Court of Tennessee,
at Knoxville.

May 18, 1992.

David B. Hill, Newport, for defendant-appellant.

Charles W. Burson, Atty. Gen. & Reporter and C. Anthony Daughtrey, Asst. Atty. Gen., Nashville, for plaintiff-appellee.

OPINION

ANDERSON, Justice.

The primary issue raised on this appeal is whether the defendant's confession, obtained after proper administration of *Miranda* warnings, is inadmissible at trial because a prior incriminating statement was obtained in violation of the Fifth Amendment of the United States Constitution and Article I, § 9 of the Tennessee

Constitution. The initial incriminating statement made by the defendant, Hosie Smith, before any *Miranda* warning was given to him was suppressed. A later confession was obtained after a search had revealed cocaine in Smith's possession and after the police had read Smith his *Miranda* rights. The admissibility of the confession was challenged on the grounds it was involuntary and tainted as the fruit of the first unwarned incriminating statement given in violation of the Federal and State Constitutions. After the trial court overruled the defendant's motion to suppress his confession, Smith was convicted of possessing more than 30 grams of cocaine with the intent to deliver, sentenced to 30 years incarceration, and fined $10,000.00. The conviction was affirmed by the Court of Criminal Appeals, after that court determined that the confession was given knowingly and voluntarily, and was thus admissible at trial. We likewise conclude that the confession was knowing and voluntary on the grounds set out herein and, therefore, affirm.

## FACTUAL HISTORY

On October 28, 1988, Officers Mike Hannan and Terry Thomas of the Tennessee Highway Patrol were traveling west on I–40 in Cocke County when they clocked a Ford Taurus station wagon traveling east at 84 miles per hour in a 65 miles-per-hour zone. As a result, the officers turned around in the median and, at approximately 5:20 p.m., stopped the vehicle that was being driven by Kellie Alisha Jones and in which the defendant was riding.

After stopping the car, Officer Hannan approached the driver's side of the vehicle and asked Jones for her license and registration. Jones was able to produce her license, but was unable to find the vehicle's registration. When Officer Hannan asked Jones to whom the car belonged, she responded that her mother, Renee Preston, owned the car.

Because it was raining, Officer Hannan then asked Jones to exit her vehicle and accompany him to his squad car while he wrote out a traffic citation. Jones agreed and exited her vehicle, after asking Smith to keep looking in the glove compartment for the vehicle's registration.

While Smith was looking for the registration, Officer Thomas, who had approached the passenger's side of the car during Officer Hannan's conversation with Jones, asked Smith questions regarding ownership of the car and the couple's destination. Smith told Officer Thomas that the car belonged to a friend of his, and that he and Jones were headed to Fayetteville, North Carolina. When Officer Thomas asked if he was going to Fayetteville on vacation, Smith responded in the negative and stated that he was going there to stay.

After this brief conversation with Smith, Officer Thomas returned to the squad car and sat in the back seat. While waiting for radio verification of Jones's license and the vehicle's registration, both officers continued to question Jones. Although she stated that the car belonged to her mother, Renee Preston, Jones could not explain the difference in the last names after answering "no" to Officer Hannan's question of whether her mother had remarried. In response to questions about the couple's destination, Jones said they were headed to Fayetteville for a one-week vacation. When asked who her passenger was, Jones stated that it was her boyfriend, but she could only give the name "Pumpkin" in response to questions about his name.

Because Smith and Jones appeared to be extremely nervous and because of the inconsistencies in their responses to questioning, the officers became suspicious and asked Jones if she was carrying any illegal items, weapons, or contraband. When Jones denied knowledge of such cargo, both officers asked her if they could have permission to look in the vehicle and its contents. At the time she was asked this question, the officers told her that she could refuse, but Jones agreed to let the officers look through the car.

While Officer Hannan was completing the traffic citation, Officer Thomas re-approached the station wagon on the passenger side and conversed again with Smith. At this time, Officer Thomas asked Smith

if there were any illegal items in the car. Smith denied knowledge of any such contraband. Thomas then advised Smith that Jones had given the officers permission to look through the vehicle and that if anything illegal were found in the car, ownership of the illegal items would be attributed to both of them.

Although Smith denied having knowledge of anything illegal being in the car, Thomas asked him again. After hesitating, Smith said, "Yes, it was probably a hot load." Thomas then asked, "By a hot load, do you mean cash, marijuana, or cocaine, one of the three?" Smith responded, "Probably."

Following this conversation, Officer Thomas began searching the station wagon. He searched the front and back seat areas before attempting to open and search the back storage compartment area. When he was unable to open the back of the station wagon with the key from the ignition, Officer Thomas crawled over the back seat into the rear storage area and discovered a locked indentured compartment.

Because he was unable to open the indentured compartment with the ignition key and because it was raining heavily, Officer Thomas asked Jones if they could take the car to a service station to break open the compartment. Jones agreed and at approximately 6:00 p.m., Officer Thomas drove the station wagon to the service station after placing Smith in the back seat of the patrol car to ride with Officer Hannan and Jones. At the service station, with Smith still in the back seat of the patrol car, the officers broke open the compartment and found a cardboard box containing 10,000 grams (22 pounds) of 94 percent pure cocaine wrapped in 10 individual packets. Upon discovering the cocaine, at approximately 6:25 p.m., the officers placed both Smith and Jones under arrest, read them their *Miranda* rights, and transported them to Highway Patrol Headquarters.

At 9:45 p.m., Smith was questioned by Officer Lonnie Hood. Before he was questioned, Smith was read his *Miranda* rights again and signed a written waiver of those rights. During the course of the interrogation, Smith gave Officer Hood an incriminating account of his employment to drive the station wagon with Jones from Oklahoma City, Oklahoma, to Fayetteville, North Carolina. This statement was reduced to writing by Officer Hood and signed by Smith.

Following a suppression hearing, the trial court held that Smith's statements about the vehicle containing a "hot load" prior to his being *Mirandized* were inadmissible. The trial court held, however, that the cocaine was admissible at trial as the fruit of a valid consensual search, and that the later written confession signed by Smith was admissible because it had been given freely, knowingly, and voluntarily.

The case proceeded to trial before a jury and Smith was convicted of possessing cocaine in excess of 30 grams with the intent to deliver, in violation of Tenn.Code Ann. § 39–6–417 (1982 & Supp.1988). The jury fined Smith $10,000.00, and the court sentenced him to serve 30 years in the Department of Corrections as a Range I offender.

The Court of Criminal Appeals affirmed the conviction and sentence.

## DISCUSSION

### I.

The dispositive issue in this case involves the admissibility of the confession given to Officer Hood and signed by Smith at the Highway Patrol Headquarters. The defendant contends that the confession was inadmissible because it was obtained in violation of his rights under the Fifth Amendment to the United States Constitution and Article I, § 9 of the Tennessee Constitution. Smith argues that his waiver of rights and his statement to Officer Hood were not voluntary, because they were tainted by Officer Thomas' conduct in first questioning Smith on the side of the interstate without administering *Miranda* warnings.

The Fifth Amendment to the United States Constitution, which is applicable to the States through the Fourteenth Amendment, *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653, 658 (1964), provides that "[n]o person ... shall be com-

pelled in any criminal case to be a witness against himself." The corresponding provision of the Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself." Tenn. Const. art. I., § 9. Although these provisions are not identical, this Court has previously declined to hold that protection under the state constitution is broader than that of the federal constitution *merely* because the language of the two provisions is not the same. *Delk v. State,* 590 S.W.2d 435, 440 (Tenn.1979). This observation, however, does not foreclose the possibility that the state constitutional provision might be applied more broadly than its federal counterpart, based upon considerations other than, and in addition to, the difference in terminology.

Prior to the decision in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the admissibility of an accused's in-custody statements depended on whether the statements were "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. *See, e.g., Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). In *Miranda,* however, the United States Supreme Court limited the admissibility of statements that would ordinarily meet the due process test of voluntariness in order to protect an accused's Fifth Amendment rights to be free from self-incrimination.

In order to combat the inherently compelling pressures of in-custody interrogation and to permit a full opportunity to exercise the privilege against self-incrimination, *Miranda* held that, prior to being subjected to custodial interrogation, "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Miranda, supra,* 384 U.S. at 467, 86 S.Ct. at 1624. The court also held that "the prosecution may not use statements, whether exculpatory, or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.,* 384 U.S. at 444, 86 S.Ct. at 1612.

The court then instructed that, at a minimum, those procedural safeguards must include warnings prior to any custodial questioning that the accused has the right to remain silent, that any statement made may be used as evidence against the accused, and that the accused has the right to have an attorney, whether retained or appointed, present during questioning. *Id.* To further protect an accused's self-incrimination rights, the court also held that although these rights may be waived, the waiver must be made "voluntarily, knowingly, and intelligently." *Id.*

Following *Miranda,* a Supreme Court majority has held that the prophylactic *Miranda* warnings are not themselves rights protected by the Constitution, but are instead measures designed to ensure that the right against compulsory self-incrimination is protected and intelligently exercised. *See, e.g., Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). Nevertheless, even the *Elstad* majority agreed that "[f]ailure to administer *Miranda* warnings creates a presumption of compulsion." *Elstad, supra,* 470 U.S. at 307, 105 S.Ct. at 1292. Furthermore, that presumption is *irrebuttable* and "unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda.*" *Id.*

In *Elstad,* a majority of the United States Supreme Court decided that, in a situation similar to that faced by the defendant in this case, a trial court must conclude that an initial confession obtained without prior warnings regarding the right against self-incrimination is inadmissible. The court went on to hold, however, that the presumption of compulsion attaching to an unwarned confession does not also apply to a subsequent confession obtained *after* administering *Miranda* warnings. In

discussing the admissibility of such a *second* confession at trial, the court stated:

> [A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.

*Id.,* 470 U.S. at 314, 105 S.Ct. at 1296.

This holding by the United States Supreme Court represented a clear break with past precedent embracing the "cat out of the bag" theory espoused in *United States v. Bayer,* 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947). In *Bayer,* the court recognized:

> Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first.

*Id.,* 331 U.S. at 540, 67 S.Ct. at 1398. *See also Martin v. State,* 1 Tenn.Crim.App. 282, 291, 440 S.W.2d 624, 628 (1968). Even in *Bayer,* however, the United States Supreme Court refused to hold that an illegally-obtained confession would forever foreclose the possibility that a subsequent admissible confession could be elicited from the defendant. In fact, in that case, the court determined that the subsequent confession given six months after the defendant's first statement would not be held invalid when the "only restraint under which [the defendant] labored was that he could not leave the ... limits [of the military base on which he lived] without permission." *Bayer, supra,* 331 U.S. at 541, 67 S.Ct. at 1398.

■ We believe that adherence to the spirit and principles of Article I, § 9 of the Tennessee Constitution requires us to recognize, as a matter of Tennessee constitutional law, the inherent reasonableness of the underlying premise expressed in *Bayer* and *Martin.* Consequently, we dispute the rationale of the *Elstad* decision that, absent coercion in eliciting an initial confession, psychological pressures and other pressures flowing from that confession can never lead a defendant to give subsequent, involuntary, incriminating statements. As noted in Justice Brennan's dissent in *Elstad,* even standard interrogation manuals used by law enforcement agencies recognize that "[i]f the first admission can be obtained, 'there is every reason to expect that the first admission will lead to others, and eventually to the full confession.'" *Elstad, supra,* 470 U.S. at 328, 105 S.Ct. at 1303 (Brennan, J., dissenting).

Like the court in *Bayer,* however, we also refuse to hold that an initial, illegally-obtained confession forever bars the prosecution from obtaining a subsequent, admissible confession from the defendant. Rather, we hold that the provisions of Article I, § 9 of the Tennessee Constitution necessitate that we recognize that extraction of an illegal, unwarned confession from a defendant raises a *rebuttable* presumption that a subsequent confession, even if preceded by proper *Miranda* warnings, is tainted by the initial illegality. That presumption may be overcome by the prosecution, however, if the State can establish "that the taint is so attenuated as to justify admission of the subsequent confession." *Elstad, supra,* 470 U.S. at 335, 105 S.Ct. at 1306–07 (Brennan, J., dissenting).

■ In each such case, the crucial inquiry for the courts becomes whether the events and circumstances surrounding and following the initial, illegal conduct of the law enforcement officers prevented the accused from subsequently (1) making a free and informed choice to waive the State constitutional right not to provide evidence against one's self, and (2) voluntarily confessing his involvement in the crime. In addressing these questions, courts should examine the following factors:

1. The use of coercive tactics to obtain the initial, illegal confession and the

causal connection between the illegal conduct and the challenged, subsequent confession;

2. The temporal proximity of the prior and subsequent confessions;

3. The reading and explanation of *Miranda* rights to the defendant before the subsequent confession;

4. The circumstances occurring after the arrest and continuing up until the making of the subsequent confession including, but not limited to, the length of the detention and the deprivation of food, rest, and bathroom facilities;

5. The coerciveness of the atmosphere in which any questioning took place including, but not limited to, the place where the questioning occurred, the identity of the interrogators, the form of the questions, and the repeated or prolonged nature of the questioning;

6. The presence of intervening factors including, but not limited to, consultations with counsel or family members, or the opportunity to consult with counsel, if desired;

7. The psychological effect of having already confessed, and whether the defendant was advised that the prior confession may not be admissible at trial;

8. Whether the defendant initiated the conversation that led to the subsequent confession; and

9. The defendant's sobriety, education, intelligence level, and experience with the law, as such factors relate to the defendant's ability to understand the administered *Miranda* rights.

In ruling upon the admissibility of a subsequent confession following the determination that an initial, unwarned confession may not be introduced in the State's case-in-chief, no single factor listed above is determinative. Rather, a court must examine the totality of the circumstances surrounding the two confessions to determine whether the subsequent confession by the defendant can truly be termed a knowing and voluntary statement.

■ The facts of this case demonstrate that Smith's subsequent confession was given knowingly and voluntarily. No coercive tactics were employed by the law enforcement officials to elicit either the first or the second incriminating statement given by the defendant. More than three hours elapsed between the time Smith was arrested and first given his *Miranda* warnings and the time when he gave his second confession to the authorities. There is no evidence in the record that Smith was in any way mistreated during that time period or that he was prevented from contacting friends, family or legal counsel. Additionally, Smith had been advised of his *Miranda* rights twice before his second statement was given (once at the time of his arrest and again immediately before the second statement), both the interrogators and the place of interrogation changed from the first illegally-obtained confession, and there is no indication that Smith did not fully understand the rights explained to him.

In fact, Smith acknowledged that he understood his rights and signed a written waiver of them. In response to questioning, Smith proceeded to give Officer Hood a statement of his involvement in the crime. There is no evidence that the interrogation producing the statement was unduly prolonged so that it could be characterized as an effort to wear down Smith's resistance and overcome his free will.

■ The only coercive influence apparent in this record is the fact that Smith was in police custody at the time of his statement and at all relevant times after his arrest. Although police custody is inherently coercive and compelling, if we were to hold this single factor sufficient to vitiate the voluntariness of a subsequent confession, an accused could never give a voluntary confession after arrest. We are unwilling to condone such a result because of our belief that "[c]onfessions remain a proper element in law enforcement." *Miranda, supra,* 384 U.S. at 478, 86 S.Ct. at 1630.

In short, our examination of the totality of the circumstances surrounding Smith's initial statement, his arrest and detention, and his subsequent confession leads us to

the inescapable conclusion that Smith knowingly and voluntarily waived his right against self-incrimination prior to giving the written confession introduced at trial in this matter. The prosecution successfully rebutted the presumption that the illegally-obtained, initial statement given on the side of Interstate 40 also tainted the subsequent confession given by Smith. As a result, that second statement was properly admitted at trial.

Our ruling today that an illegally-obtained, initial confession is presumed, subject to rebuttal, to have tainted any subsequent confession, even if the later statement is preceded by proper *Miranda* warnings, expressly rejects the United States Supreme Court majority holding in *Oregon v. Elstad.* We believe, however, that the provisions of Article I, § 9 of the Tennessee Constitution mandate that the State, after illegally obtaining an incriminating statement from a defendant, must establish that the subsequent confession was given freely and voluntarily and that the constitutional right to be free from self-incrimination was not waived due solely to the psychological pressures resulting from giving the previous statement. Only then can we be assured that criminal defendants are not being unconstitutionally compelled "to give evidence against [themselves]."

The Concurring Opinion expresses concern that our retention of the "cat out of the bag" rule that an illegally obtained initial confession is presumed, subject to rebuttal, to taint a later confession will enable defendants to have confessions suppressed by merely demonstrating that their arrest and detention was psychologically stressful. This concern is unfounded because the "cat out of the bag" theory was adopted in 1947 by the U.S. Supreme Court in *United States v. Bayer, supra,* and was followed until the Court's split decision in 1985 in *Oregon v. Elstad, supra,* and there is no evidence that confessions were suppressed during that nearly 40–year period by merely showing that arrest and detention was stressful. In addition, as previously pointed out, *Bayer,* the case that espoused the "cat out of the bag" theory, expressly recognized that the first inadmis-sible confession does not perpetually disable a defendant from subsequently giving an admissible confession.

## II.

■ The defendant also contends that the consensual search of the station wagon was not valid because the officers never asked *him* for permission to search the car. Persons having equal rights to use or occupy premises may, however, consent to a search of them and the consent will be binding upon the co-occupants. *Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969); *Lester v. State,* 216 Tenn. 615, 620, 393 S.W.2d 288, 290 (1965). Because Kellie Jones had an equal right to use and occupy the vehicle, her voluntary consent to search is valid and binding upon Smith as well. There is no merit to this issue.

## III.

Finally, the defendant submits that the sentence imposed upon him after conviction was excessive. We concur in the conclusion of the Court of Criminal Appeals that this issue is also without merit.

The defendant's conviction is affirmed in all respects. The costs of this appeal are adjudged against the defendant.

REID, C.J., and DAUGHTREY, J., concur.

DROWOTA, J., files a separate concurring opinion in which O'BRIEN, J., joins.

DROWOTA, Justice, concurring.

I would affirm but apply the rule announced by the United States Supreme Court in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). Specifically, I agree with that Court that "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary." *Id.* at 318, 105 S.Ct. at 1297–98.

In *Elstad,* the United States Supreme Court held that "a suspect who has once responded to unwarned yet uncoercive

questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318, 105 S.Ct. at 1298. Under *Elstad*, the factfinder is directed to "examine the surrounding circumstances and the entire course of police conduct" and thereby reach a determination as to whether the defendant's post–*Miranda* statement was voluntarily made, *see id.;* because the trial court properly conducted this inquiry, I would affirm.

While the majority purports to adopt a presumption, apparently gleaned from Justice Brennan's dissent in *Elstad*, that an illegally obtained initial confession taints any subsequent confession, I submit that the majority does nothing more than examine the totality of the circumstances in order to determine whether Smith's post–*Miranda* statement was voluntarily made.

Further, the "psychological stress" component of the majority's presumption, *see supra* at —— ("the State ... must establish that the subsequent confession was given freely and voluntarily and that the constitutional right to be free from self-incrimination was not waived due solely to the psychological pressures resulting from giving the previous statement"), gives reason for pause: Were the majority to actually apply Justice Brennan's "cat out of the bag" presumption, it is difficult to imagine that Smith's post–*Miranda* statement would be found free of taint. Smith waived his *Miranda* rights a mere three hours after his initial statement, and at a time when he was burdened by the "psychological stress" of knowing the police found 10,000 grams (22 pounds) of 94 percent pure cocaine in his car.

Finally, because Defendant's subsequent confession is clearly admissible, I decline the opportunity to circumscribe the boundaries of Article I, Section 9, of the Tennessee Constitution.

I am authorized to state that Justice O'BRIEN concurs in this concurring opinion.