# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs February 6, 2001

## STATE OF TENNESSEE v. DONALD JOHNSON, JR.

**Direct Appeal from the Criminal Court for Shelby County**
**No. 98-06093     Bernie Weinman, Judge**

---

**No. W2000-00875-CCA-R3-CD  - Filed March 28, 2001**

---

Defendant was convicted by a Shelby County jury of felony murder and received a life sentence.  In this appeal, defendant alleges:  (1) the trial court erred in failing to suppress both his oral and written statements given to authorities; and (2) the state improperly exercised its peremptory challenges based upon race and gender.  Upon our review, we are unable to resolve the suppression issue due to inadequate findings of fact and, therefore, remand for further findings regarding the oral and written statements.  We conclude the trial court correctly ruled that there were legitimate race and gender-neutral reasons for the peremptory challenges. The judgment of the trial court is vacated, and the case is remanded for further findings and/or proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Vacated;**
**Remanded**

JOE G. RILEY, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JERRY L. SMITH, JJ., joined.

A. C. Wharton, Jr., Public Defender; W. Mark Ward (on appeal), Phyllis L. Aluko (at trial), and Michael J. Johnson (at trial), Assistant Public Defenders, Memphis, Tennessee, for the appellant, Donald Johnson, Jr.

Paul G. Summers, Attorney General and Reporter; Laura E. McMullen, Assistant Attorney General; William L. Gibbons, District Attorney General; Charles W. Bell, Jr. and Rosemary Andrews, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Defendant was convicted by a Shelby County jury of felony murder and received a life sentence.  In this appeal, defendant alleges:  (1) the trial court erred in failing to suppress both his oral and written statements given to authorities; and (2) the state improperly based its peremptory

challenges upon race and gender. Upon our review of the record, we find it necessary to remand for further findings with regard to the statements given to authorities. Accordingly, we vacate the judgment of the trial court and remand for further findings and/or proceedings.

## FACTS

Although the defendant does not challenge the sufficiency of the evidence, we give the following brief recitation of facts. On November 20, 1997, at approximately 9:00 p.m., two masked gunmen entered the Tobacco Discount Beverage Store and took approximately $600 in cash. During the robbery, a store clerk was fatally shot in the back of the head. At trial, one of the two surviving clerks testified as to the estimated height and weight of each perpetrator. The seventeen-year-old defendant matched the physical description of one of the perpetrators.

On November 25, 1997, defendant was arrested as was Demetrius Green. Green gave a statement to authorities implicating the defendant in the robbery and murder. Since the defendant was a juvenile, his mother was contacted. After her arrival, the defendant gave an oral statement and subsequently signed a typewritten statement admitting his involvement in the robbery and murder. The defendant admitted being the actual shooter of the victim, although he claimed it was an accident.

Defendant was convicted by the jury of first degree murder in perpetration of robbery and received a life sentence.

## I. MOTION TO SUPPRESS

Defendant argues the trial court improperly denied his motion to suppress his oral and typewritten statements to police. The defendant contends that his initial oral statement was given without a knowing waiver of his Miranda rights, and that this statement tainted his subsequent typewritten statement and thereby precluded its admissibility as well.

### A. Testimony at Suppression Hearing

At the suppression hearing, the arresting officer, Michael J. Clark, testified that he arrested the defendant on November 25, 1997, at 5:11 p.m. The defendant was not given Miranda warnings at the time of the arrest. Officer Clark stated that while transporting the suspect to the jail, he offered to stop and get the defendant something to eat or drink, but the defendant declined the offer. Officer Clark testified that the defendant was not questioned on the way to the station and was not questioned at the station until his mother arrived. Although defendant's mother was contacted several times at work after defendant's arrest, she did not arrive at the police department until 10:57 p.m. Officer Clark further stated that he then asked the defendant's mother to speak with the

defendant privately. Thereafter, the defendant, with his mother's encouragement, agreed to talk to authorities.

Officer Clark stated that he gave the defendant, in the presence of his mother, the Miranda waiver of rights form, and the defendant read the waiver aloud. He claimed that the defendant had no trouble reading the form; the defendant signed the form at 11:35 p.m.; and the defendant stated that he understood the form and had no questions regarding the waiver of his rights. Furthermore, Clark stated that the defendant did not appear to be under the influence of drugs or alcohol. Officer Clark also indicated that the defendant's mother read the waiver form and said she understood it. Officer Clark testified that, thereafter, he conducted an oral "fact finding interview" which lasted about one and one-half hours.

After this oral interview, defendant's formal statement was taken at 2:31 a.m. Officer Clark testified that the delay between the two statements was due to the inability to immediately secure a transcriptionist. Officer Clark testified that he read to the defendant the Miranda warnings before the typewritten statement was taken, and the defendant indicated he understood the warnings and wanted to give the statement. Both the defendant and his mother signed and initialed each page of the typewritten statement.

Defendant's sister, Shamika Johnson, testified that she was present at the defendant's arrest, and the officers did not verbally advise the defendant of his rights. She claimed that the defendant was not sober at the time of the arrest; her brother could not read very well; and he had trouble comprehending certain words.

Defendant's mother testified that when she arrived at the police department, the defendant was sitting in a room with two officers who kept telling him to "quit lying." She claims that when the defendant started talking, the officer said, "you're lying . . . I don't want to hear that . . . I'm going to get your girlfriend and lock her up and she's going to have a baby in here." She claimed that her son had not yet been advised of his rights. Thereafter, Ms. Johnson entered the room and told her son that she was tired and he needed to tell the truth, or she was going to leave him in jail. She testified that the defendant began crying, and the officers would not allow him to have food or water or go to the bathroom. Ms. Johnson testified that she told the officers she was tired because she had worked from 7:00 a.m. to 10:30 p.m. every night that week.

Ms. Johnson testified that she did not read the waiver of rights form before she signed it and did not see nor hear the defendant read it. She also testified that the defendant "can't read that good" and would not have been able to understand the form if he had read it. She further stated that the defendant had been diagnosed as "somewhat" mentally retarded and claimed that when he becomes agitated, the defendant cannot understand things clearly. Ms. Johnson further testified that neither she nor the defendant read the written statement before signing it, and that the police officer did not read the statement to the defendant. Finally, Ms. Johnson claimed that neither she nor defendant signed a waiver of rights form until after the written statement was typed.

The defendant testified that he was not informed of his rights at the time of his arrest. He claimed the officers began asking him questions before his mother arrived, and the officers got upset and began hitting the table. He testified that once his mother arrived, the officer handed him a piece of paper which he signed without reading it. Defendant further claimed that he smoked marijuana immediately prior to his arrest. With regard to his typed statement, the defendant stated the officer read the questions and answers, and he shook his head yes or no. Defendant further claimed he was not offered anything to eat or drink, not allowed to go the bathroom, and had not slept for over twenty-four hours.

Dr. Fred Steinberg, a clinical psychologist who evaluated the defendant, found defendant had a verbal I.Q. of 67 and an overall I.Q. of 69, which is in the mildly mentally retarded range. Dr. Steinberg further found the defendant could only read at a second grade level. He concluded that the defendant would be unable to read the waiver of rights form and comprehend what he was reading. However, he also concluded that if someone else read his rights to him, he would be more likely to comprehend them.

The state offered the testimony of Dr. Rebecca Caperton, a psychologist for the Shelby County Juvenile Court. Dr. Caperton testified that her testing revealed the defendant had an I.Q. of 83, which is borderline between the low average and mildly mentally retarded ranges. She testified that it was "questionable" whether the defendant could read his Miranda warnings at all, due to his low reading level. Finally, Dr. Caperton stated that she concurred with Dr. Steinberg's finding that the defendant "basically cannot read," but testified that if his rights were explained to him verbally, the defendant would be more likely to understand them. However, Dr. Caperton also testified that even though she would be surprised if the defendant was able to read his rights aloud, she felt that, if he could in fact read, he could "understand verbally what is going on."

The defendant offered rebuttal testimony by Dr. Lynn Zager, who testified that the test administered by Dr. Caperton is not an appropriate indicator of a person's I.Q. Dr. Zager further testified that the mere ability to recognize words does not parlay into an understanding of what those words mean.

## B. Standard of Review

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this Court unless the evidence contained in the record preponderates against them. State v. England, 19 S.W.3d 762, 766 (Tenn. 2000). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, this Court is not bound by the trial court's conclusions of law. State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998). The application of the law to the facts found by the trial court are questions of law that this court reviews *de novo*. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. Braziel v. State, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

This court may also consider evidence adduced at trial in evaluating the correctness of the ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 297-98 (Tenn. 1998). We have carefully reviewed the trial testimony and find no significant discrepancies in the testimony of the witnesses, nor any other additional testimony that would bear upon the motion to suppress. Thus, we will confine our analysis to the suppression hearing testimony.

## C. Waiver of Miranda Rights

The fact that one suffers from certain mental deficiencies does not necessarily prevent that person from understanding and waiving constitutional rights. *See generally*, State v. Middlebrooks, 840 S.W.2d 317, 327 (Tenn. 1992); IV Wharton's Criminal Evidence § 643, p. 169 (14th ed. 1987). A person with a mental deficiency may waive his Miranda rights, if that waiver was knowingly and voluntarily made. State v. Green, 613 S.W.2d 229, 233 (Tenn. Crim. App. 1980); Braziel v. State, 529 S.W.2d 501, 505-06 (Tenn. Crim. App. 1975). When determining whether an accused has voluntarily, knowingly and intelligently waived his Miranda rights, this court must consider the totality of the circumstances which existed when the accused waived these rights. Middlebrooks, 840 S.W.2d at 326; State v. Benton, 759 S.W.2d 427, 431 (Tenn. Crim. App. 1988). The totality of the circumstances must reveal "an uncoerced choice and the required level of comprehension." State v. Blackstock, 19 S.W.3d 200, 208 (Tenn. 2000) (quoting State v. Stephenson, 878 S.W.2d 530, 545 (Tenn. 1994)). Where a defendant contends that his waiver of Miranda rights was not voluntarily or understandingly made due to his age and borderline range of intelligence, the court must consider such factors as the defendant's age, educational background, mental competence and ability, prior criminal justice experience, demeanor, responsiveness to questioning, possible malingering, and the manner in which the Miranda rights were explained. Blackstock, 19 S.W.3d at 208. However, no single factor is necessarily determinative. *Id*.

## D. Trial Court's Findings

After hearing testimony, the trial court took the motion under advisement and subsequently entered an order denying the motion. The only portions of the order relating to the facts and conclusions of law are the following:

> . . . .
> The police officer testified to the effect that the defendant read the Miranda warnings out loud in the presence of his mother, and he stated that he advised the defendant orally of his rights before he took a written statement from the defendant.
>
> The defendant and his mother maintain that no advice of rights was given, but the mother indicated that she told her son to tell the truth. The mother stated that due to the fact that she was working a double shift, she kept falling asleep during questioning of her son. The mother and sister testified to the effect that the defendant was not capable of reading the Miranda warnings.

There were some differences in the testimony of the psychologists but they agreed that due to the defendant's low IQ he probably could not read his rights and understand what he was reading, but there was testimony to the effect that he probably would understand his rights if they were read to him.

. . . .

Based on all the evidence adduced at this hearing, including the Court's observations of the defendant, the Court is of the opinion that the defendant has the capacity to understand the <u>Miranda</u> warnings and that he was made aware of his rights prior to making a statement. The Court finds, with the encouragement of his mother and his own volition, the defendant voluntarily made a statement to law enforcement officers.

There were numerous and fundamental conflicts in the testimony of Officer Clark versus the testimony of the defendant and his mother. The first two paragraphs of the order do not constitute findings but are merely a brief summary of conflicting testimony. Therefore, the numerous conflicts were not resolved. However, in the final paragraph of the order, the trial court concluded that the defendant "has the capacity to understand the <u>Miranda</u> warnings and that he was made aware of his rights prior to making a statement." We must agree with the defendant, however, that these findings are unclear as they do not specify whether they referred to the oral statement, the typewritten statement, or both. Specifically, it is unclear whether the trial court found defendant understood his <u>Miranda</u> waiver by reading the warnings aloud prior to the oral statement, or when they were read to him before the typewritten statement, or both. We are likewise uncertain as to whether the third paragraph of the order is merely a summary of expert testimony, or whether the trial court, based upon the expert testimony, found the defendant "probably could not read his rights and understand what he was reading, but . . . would understand his rights if they were read to him."

**E. Necessity for Remand**

We are unable to conduct an analysis of this issue based upon the record before us. *See* <u>State v. Raspberry</u>, 640 S.W.2d 227, 229 (Tenn. Crim. App. 1982); <u>State v. Alonzo Gentry</u>, C.C.A. No. 02C01-9708-CC-00335, 1998 WL 351228, at *2 (Tenn. Crim. App. filed July 2, 1998, at Jackson) (judgment vacated and case remanded for findings of fact on motion to suppress). If the trial court found, pursuant to the expert testimony, that the defendant could not read his rights aloud and understand them, the oral statement given by the defendant should have been suppressed. Officer Clark unequivocally testified that the defendant read the <u>Miranda</u> warnings himself, and they were not read to him at any time prior to the oral statement. There is no contrary testimony. If the trial court so found, then the defendant did not have the "required level of comprehension" to knowingly waive his <u>Miranda</u> rights by signing the waiver after reading the rights aloud. *See* <u>Blackstock</u>, 19 S.W.3d at 208 (quoting <u>Stephenson</u>, 878 S.W.2d at 545).

-6-

On the other hand, if the trial court found that the defendant in fact read all of his rights aloud and understood he was waiving those rights prior to the oral statement, then the oral statement was properly admitted. In order to make such a finding, however, it would appear the trial court would have to rely upon the final portion of Dr. Caperton's testimony. This, perhaps, is unlikely as this testimony was never mentioned in the trial court's order. Nevertheless, we are hesitant to speak for the trial court.

If the trial court determines the oral statement was improperly admitted, a further analysis will be required with regard to the typewritten statement. In State v. Smith, 834 S.W.2d 915 (Tenn. 1992), the Tennessee Supreme Court recognized that Miranda-poor statements could weigh upon the defendant's mind and substantially contribute to his or her involuntarily waiving the rights after proper Miranda warnings on a subsequent interview. *Id.* at 919. Therefore, that court held that under the extra protections of the Tennessee Constitution, "extraction of an illegal, unwarned confession from a defendant raises a rebuttable presumption that a subsequent confession, even if preceded by proper Miranda warnings, is tainted by the initial illegality." *Id.* The state may overcome this presumption by demonstrating "that the taint is so attenuated as to justify admission of the subsequent confession." *Id*. (quoting Oregon v, Elstad, 470 U.S. 298, 335, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985) (Brennan, J., dissenting)).

The crucial inquiry in making such a determination is whether the defendant subsequently made a free and informed choice to waive his right against self-incrimination and voluntarily confessed to the crime. Smith, 834 S.W.2d at 919. To determine the effect of the prior improper statement, courts should evaluate the "totality of the circumstances surrounding the two confessions" in the context of the following nine factors:

1. The use of coercive tactics to obtain the initial, illegal confession and the causal connection between the illegal conduct and the challenged, subsequent confession;

2. The temporal proximity of the prior and subsequent confessions;

3. The reading and explanation of Miranda rights to the defendant before the subsequent confession;

4. The circumstances occurring after the arrest and continuing up until the making of the subsequent confession including, but not limited to, the length of the detention and the deprivation of food, rest, and bathroom facilities;

5. The coerciveness of the atmosphere in which any questioning took place including, but not limited to, the place where the questioning occurred, the identity of the interrogators, the form of the questions, and the repeated or prolonged nature of the questioning;

6. The presence of intervening factors including, but not limited to, consultations with counsel or family members, or the opportunity to consult with counsel, if desired;

7. The psychological effect of having already confessed, and whether the defendant was advised that the prior confession may not be admissible at trial;

8. Whether the defendant initiated the conversation that led to the subsequent confession; and

9. The defendant's sobriety, education, intelligence level, and experience with the law, as such factors relate to the defendant's ability to understand the administered <u>Miranda</u> rights.

*Id*. at 919-20. No single factor listed above is determinative. *Id*.

If the trial court determines the oral statement was improper, then there must be several factual determinations in order to analyze these nine factors and determine whether the typewritten statement was admissible. There was considerable conflicting testimony relating to these factors which can only be resolved by the trial court.

## F. Directions Upon Remand

In summary, we vacate the judgment of conviction and remand to the trial court for further findings.[1] No further testimony or hearings will be necessary unless the trial court feels it is unable to make these determinations based upon the existing record. The trial court should first render findings of fact and conclusions of law regarding the oral statement. If the trial court determines the oral statement was not properly admitted, the trial court shall then render findings of fact and conclusions of law regarding the typewritten statement. The trial court will utilize the nine factors in <u>Smith</u> to make this determination. If the trial court determines the typewritten statement was not properly admitted, it shall grant a new trial. If the trial court determines the typewritten statement was properly admitted, the trial court shall enter an order reinstating the judgment of conviction from which ruling the defendant may appeal pursuant to Tenn. R. App. P. 3(b).

We further conclude that if the oral statement is found to be inadmissible by the trial court, its admission will be considered harmless, provided the typewritten statement is found to be admissible by the trial court and this court. Trial testimony concerning the oral statement was

---

[1] Similar orders of remand have been utilized by this court due to inadequate factual findings. *See* <u>State v. Mark Anthony Griffin</u>, C.C.A. No. E1999-00122-CCA-R3-CD, 2000 WL 1221873 (Tenn. Crim. App. filed August 29, 2000, at Knoxville); <u>State v. Robert Blocker</u>, C.C.A. No. E1999–01624-CCA-R3-CD, 2000 WL 726447 (Tenn. Crim. App. filed June 5, 2000, at Knoxville); <u>State v. Keith Slater</u>, C.C.A. No. 01C01-9709-CC-00435, 1999 WL 32912 (Tenn. Crim. App. filed January 27, 1999, at Nashville); <u>State v. William Chouinard</u>, C.C.A. No. 03C01-9311-CR-00357, 1995 WL 50752 (Tenn. Crim. App. filed February 9, 1995, at Knoxville).

limited compared to the verbatim recital of the typewritten statement. The typewritten statement was read verbatim to the jury, is very detailed, and fully describes defendant's role as the triggerman.[2] In view of the detailed, incriminating nature of the typewritten statement, we conclude that the admission of the oral statement would be harmless error if the typewritten statement was properly admitted. Therefore, if the trial court and this court determine the typewritten statement was properly admitted, there will be no need for this court to again address the effect of the erroneous admission of the oral statement.

## II. PEREMPTORY CHALLENGES

The defendant next claims that the state improperly used its peremptory challenges to strike African-American females from the jury. *See* Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). During jury selection, the state used four peremptory challenges to remove African-American females from the venire. The trial court determined that the state offered race and gender-neutral reasons for its challenges. The jury in this case ultimately included four African-Americans, three of whom were female.

### A. Standard of Review

In Batson, the United States Supreme Court held that a state's use of peremptory challenges to intentionally exclude jurors of the defendant's race violates the defendant's right to equal protection. 476 U.S. at 89. The Court upheld this principle in Powers v. Ohio, but eliminated the requirement that the defendant and the potential juror share the same race. 499 U.S. 400, 415, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). The Court subsequently held that peremptory strikes based solely on gender are also constitutionally impermissible. J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 140, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994); *see* State v. Turner, 879 S.W.2d 819, 821-23 (Tenn.1994).

A defendant seeking to raise a Batson claim must first make a prima facie showing of purposeful discrimination against a prospective juror. Batson, 476 U.S. at 93-94. The defendant must establish that a consideration of all the relevant circumstances raises an inference of purposeful discrimination. Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 903 (Tenn.1996). Once the defendant establishes a prima facie showing of purposeful discrimination, the burden then shifts to the state to establish a neutral basis for the challenge. Batson, 476 U.S. at 97. The state's explanation cannot be based on mere "stereotypical assumptions," but it need not rise to the level of a challenge for cause. State v. Ellison, 841 S.W.2d 824, 826 (Tenn. 1992) (citing Batson, 476 U.S. at 97).

---

[2]Although defendant contends in his statement that the shooting was accidental, this would be no defense to first degree murder in perpetration of robbery. *See* State v. Middlebrooks, 840 S.W.2d 317, 336 (Tenn. 1992).

In ruling on peremptory challenges, the trial court must give specific reasons for each of its factual findings. Woodson, 916 S.W.2d at 906. The trial court should explain why the objecting party has or has not established a prima facie showing of purposeful discrimination. If the defendant has made a prima facie showing, the court must determine whether the state gave a neutral reason and whether it finds that the challenge was the result of purposeful discrimination. *Id*. The trial court's findings are to be accorded great weight and will not be set aside unless they are clearly erroneous. *Id*.

### B. Trial Court's Findings

In this case, the trial court did not explicitly state whether the defendant made a prima facie showing of discrimination. Initially, the trial court concluded that the defendant had failed to show there was a pattern of discrimination and allowed *voir dire* to continue. Thereafter, a jury was empaneled. The next morning the trial court reversed its position and concluded the exclusion of the four African-American women required the state to explain its challenges. Based upon the state's explanations, the trial court found that there was "good cause for the challenges on the mind of the state," and they were not based on race or gender.

### C. Analysis

The four challenges at issue related to jurors Myles, Lacy, Parham and Jones. Juror Myles stated that she could not pass judgment on another person, was feeling ill, and repeatedly requested that she be allowed to serve on another case. Juror Lacy stated that she had two nephews "doing time," one for murder, and was unsure whether this would affect her impartiality. With regard to jurors Parham and Jones, the prosecutor stated that they were dismissed because they were non-responsive to his questions, timid, and appeared uncomfortable. Based upon a careful examination of the record before us, we cannot say that the trial court's findings were clearly erroneous.

### CONCLUSION

Upon careful review of the record, we conclude the state did not improperly exercise its peremptory challenges. We further conclude that the findings of the trial court are inadequate for this court to review the suppression issue. Accordingly, we vacate the judgment of conviction and remand for further findings and/or proceedings as more fully described elsewhere in this opinion.

_____
JOE G. RILEY, JUDGE