# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
April 17, 2013 Session

## STATE OF TENNESSEE v. JAMES MICHAEL NAIVE

**Appeal from the Circuit Court for Williamson County**
**No. II-CR105236      Timothy Easter, Judge**

---

**No. M2012-00893-CCA-R3-CD - Filed August 21, 2013**

---

The defendant, James Michael Naive, appeals his Williamson County Circuit Court conviction of first degree murder, claiming that the trial court erred by denying his motions to suppress both the statement he made to police and his bank records, that the evidence was insufficient to support his conviction, and that the trial court erred by admitting certain witness testimony and by permitting a witness for the State to remain in the courtroom prior to his testimony. In addition, the defendant claims that the prosecutor committed misconduct by impermissibly shifting the burden of proof to the defense during closing argument. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

James L. Elkins III, Assistant Public Defender, for the appellant, James Michael Naive.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Kim R. Helper, District Attorney General; and Mary Katharine White, Assistant District Attorney General; for the appellee, State of Tennessee.

## OPINION

On July 16, 2010, the defendant fatally shot his sister, the victim, Elizabeth Swaney, at their family home in Brentwood. The Williamson County grand jury charged the defendant with premeditated first degree murder, and the trial court conducted a jury trial in February 2011.

At trial, Brentwood Police Department officer David Twiford testified that, on

the afternoon of July 16, 2010, he was on patrol in the southern area of Brentwood with a trainee, Jeff Benson. At approximately 3:20 p.m., Officer Twiford received a call about a shooting in his zone. The dispatcher stated that a man called 9-1-1 to report that he had accidentally shot his sister in the head. Officer Twiford and Officer Benson proceeded directly to the scene of the shooting, arriving at approximately 3:24 p.m. Upon their arrival at 8229 Alamo Road ("the Brentwood residence"), Officer Twiford noticed the defendant standing on the front porch, holding a cordless telephone. When the defendant saw the officers, he threw the telephone into a flower pot on the porch, put his hands in the air, and began walking toward the police car.

The officers exited their vehicle and approached the defendant, who Officer Twiford described as "strangely calm." The officers asked the defendant "what's going on here," to which the defendant responded, "I shot my sister." Officer Benson placed handcuffs on the defendant and explained to him that the handcuffs were necessary until they discerned what had happened. According to Officer Twiford, the defendant replied, "[Y]eah, yeah, I know. You got the right person. . . . I did it."

Another officer, Christopher Burgdorf, arrived on the scene and took custody of the defendant. At that point, Officer Twiford and Officer Benson entered the Brentwood residence. Upon entering the house, the officers proceeded down a short hallway that opened into a family room. They encountered an elderly woman standing with a walker and an elderly man seated in a recliner, tethered to medical equipment. The victim was lying across an ottoman in front of a sofa. Officer Twiford testified that it appeared that the victim had been seated on the ottoman when she was shot and that she had fallen backward, so that her head was resting on the floor and her feet were underneath the sofa. The victim was gasping for breath, and a large pool of blood had formed on the left side of her head.

Medical personnel arrived a short time later to attend to the victim, and Officer Twiford attempted to speak with the elderly man and woman in the room, who were later identified as Marvin and Jewell Naive, the parents of the defendant and the victim. Officer Twiford's attempts to converse with Mr. and Mrs. Naive convinced him that both were suffering from dementia or similar conditions. Officer Twiford also testified that he located a firearm on the seat of a rocking chair in the family room, near the entrance to the kitchen. The firearm was fully loaded, but one round had been fired.

Officer Christopher Burgdorf with the Brentwood Police Department testified that, when he arrived at the Brentwood residence on July 16, he took custody of the defendant, who was already in handcuffs and seated against a tree in the front yard of the residence. Officer Burgdorf began gathering basic information from the defendant, during which time the defendant made statements to the effect of "it's finally over" and "now Dad

can finally get some rest." Officer Burgdorf did not address these statements and simply continued gathering information. He testified that the defendant was very calm, relaxed, and "seemed at peace with the situation." He was not emotional, and he never inquired about the victim. The defendant complained to Officer Burgdorf that ants were crawling on his hands, so the officer moved the defendant to the back seat of the patrol car. Once the defendant was seated in the patrol car, his demeanor remained calm.

At the direction of Lieutenant William Ambrose, Officer Burgdorf transported the defendant to the Brentwood Police Department for booking and an interview, and he then transported the defendant to the county jail. Officer Burgdorf was not present during the defendant's police interview, but he was present for booking. During the booking process, Officer Burgdorf did not notice any wounds or injuries on the defendant that would be indicative of a struggle. Officer Burgdorf testified that, during the entire hour and a half to two hours that he spent with the defendant, the defendant's demeanor never changed. He remained calm, cooperative, and very compliant. Officer Burgdorf stated that at no point did the defendant express any concern about the victim.

Lieutenant Ambrose testified that he retired from the Brentwood Police Department in February 2011 after 32 years of service. He stated that he was the lead detective in the defendant's case.

When Lieutenant Ambrose arrived on the scene on July 16, medical personnel were loading the victim into an ambulance. He briefly examined the scene and then returned to the police department to interview the defendant. He explained that it was his habit to start his police interviews with basic, "getting-to-know-you" questions prior to giving *Miranda* warnings. In the course of this questioning by Lieutenant Ambrose, the defendant explained that his family owned the Brentwood residence and a large farm in Shelbyville ("the Shelbyville farm"). His parents had lived on the Shelbyville farm from 1976 until the mid-1980s, and then they moved to the Brentwood residence following his mother's heart attack. In mid-April 2010, his father suffered a stroke. The defendant had been caring for his parents since his father's release from a health care facility. After asking several general questions about the defendant's family, Lieutenant Ambrose asked the defendant who was living in the Brentwood residence, and the defendant answered that he and his parents lived there and stated "[m]y sister, the girl I shot, comes by." Lieutenant Ambrose did not address this statement but instead continued his general questioning. He testified that it was important for him to learn who was in the house at the time of the shooting so he could discern if anyone else had knowledge of the shooting.

The recording of the defendant's interview, which was played for the jury, contained the following exchange between Lieutenant Ambrose and the defendant:

Ambrose:      Okay, how long had [the victim] been staying [at the Brentwood residence]?

Defendant:    She hasn't been staying there. She invaded the [Brentwood residence] when we left. She's broke into the bank accounts. Got my mama's pearls and stuff. Tried to put me out of the damn house, so she could move in. I tell you what you know and other people will back this up, I have been trying to stay focused on taking care of [my parents]. It's 24 hours a day. He sh**s all over himself. I got to take care of that all night and all day. And [the victim]'s stealing from us. I took [my father] down there. He wanted anything more than the world to go back to the [Shelbyville] farm. I got him down there and he was the happiest son of a b**** you have ever seen. Really happy. Then they started in. Started in on the money sh**.

Ambrose:      Who was that when you say -

Defendant:    Swaney, Beth.

Ambrose:      Beth.

Defendant:    And we're going to have to move him back. She's going to get a babysitter. She's going to move into that house. All kinds of different crap. So anyway, she pushed it to the point where we brought him back up today. It nearly killed him. You can ask my daughter. I've told her and told her it's reckless endangerment, you can't split them up. You can't do these kind of things to fragile people like that. Here is a man crying not wanting to leave.

Ambrose:      Hm hm.

Defendant:    Well, anyway, we get up here. Just crying about

-4-

it wanting to go home, what's going on.  So she comes in –

Ambrose:     Hm hm.

Defendant:   – and starts with him and he starts screaming and sh**, man you're killing me, y'all are killing me, y'all are killing me.  So I walked upstairs and killed her.

Ambrose:     Whoa, now, Mr. Naive.

Defendant:   I'm all right.  I'm sorry.

Ambrose:     That's all right, that's all right.  Just take a minute.  Just calm down.  Get you a drink of water.

Defendant:   What have I done?

Ambrose:     Um now, when we start talking about your sister, here is where we need to stop for a moment.  Um, this is at the point in time where I have to read you your rights.

Defendant:   Yes, sir, I understand.

At that point in the interview, Lieutenant Ambrose issued the defendant *Miranda* warnings, and the defendant signed a waiver of his rights.  The defendant then proceeded to explain the events leading to the shooting.  He told Lieutenant Ambrose that he and his sister had disagreed about the health care of their parents; the defendant wanted to care for them at the Shelbyville farm, but the victim wanted their parents to live at the Brentwood residence so that she could oversee their care.  On the morning of July 16, the defendant left his parents at the Shelbyville farm in the care of his daughter, Marilyn, and he returned to the Brentwood residence to prepare the house for his parents' arrival.  The defendant told Lieutenant Ambrose that, among other things, he "made some notes about the situation between him" and the victim.  The notes were later found in the defendant's bedroom and referenced "reckless endangerment."  At approximately 1:30 p.m., the defendant's daughter arrived at the Brentwood residence with his parents.  Sometime later, the victim arrived, and the defendant and the victim got into an argument that escalated.

According to Lieutenant Ambrose:

> And [the defendant] said that they were – his sister was calling him a no good bum, and then the father was in there saying you are killing me, you are killing me. . . . [The defendant] said that his sister got in the face of his . . . father. He said that he got involved in the conversation and it just kept on and on and on and so he – after that he said he went upstairs and got his gun and he come down and ended it.

Lieutenant Ambrose testified that although the defendant briefly showed remorse, stating that he was sorry and asking what he had done, the period of remorse did not last long.

At Lieutenant Ambrose's request, the defendant drew a diagram of his bedroom, indicating the chest of drawers where he stored the handgun used in the murder. The defendant told Lieutenant Ambrose that he walked upstairs to retrieve the gun, approached his sister from behind, and shot her in the back of the head.

During the course of the interview, the defendant granted the Brentwood Police Department permission to search both the Shelbyville farm and the Brentwood residence. At the Shelbyville farm, Lieutenant Ambrose discovered several bulls-eye targets, .38 caliber ammunition, and a weathered, hand-drawn picture of a human face that appeared to have multiple bullet holes in it. At the Brentwood residence, Lieutenant Ambrose discovered similar drawings.

With respect to financial issues, the defendant told Lieutenant Ambrose that he and the victim had disagreements about the use of their parents' Regions Bank checking account. In the interview, the defendant, who paid bills for his parents from this account, stated that he was unable to procure bank statements from the victim and that "he had to force [the victim] to give him a banking statement." Lieutenant Ambrose subpoenaed the bank records of both the defendant and the defendant's parents. Lieutenant Ambrose testified that he conducted an interview with a Regions Bank employee who had met with the victim within one week of the shooting, but he was unable to testify about the substance of the interview.

On cross-examination, Lieutenant Ambrose admitted that, during the course of his interview with the defendant, the defendant did show some emotion and that the defendant had talked about the Veterans Administration and Vietnam. Lieutenant Ambrose also acknowledged that the defendant did not want his parents to be shuttled back and forth between the Shelbyville farm and the Brentwood residence because he thought it amounted

to reckless endangerment.

On redirect examination, Lieutenant Ambrose confirmed that the defendant had stated that the victim had "accused him of spending down the [checking] account," that the victim "was coming in and trying to take over," and that the victim "had gone to Regions Bank to take steps to – that interfered with what [the defendant] wanted to do." Lieutenant Ambrose also confirmed that the wills of Marvin and Jewell Naive listed both the victim and her brother, Thomas B. Naive, as executors; the defendant, the Naives only other surviving child,[1] was not named as an executor to either will.

Marilyn Naive Barrett, the defendant's daughter, testified that she had a good relationship with the victim. She stated that she, her husband, and their small child resided at the Shelbyville farm with the defendant for a few months in 2010. Her grandfather, Mr. Naive, suffered a stroke on April 13, 2010, and was released from a health care facility in June. Initially, the family discussed admitting the Naives to a nursing home facility, but they eventually decided to bring the couple to the Brentwood residence, where Ms. Barrett, the defendant, and the victim would care for them. On July 3, the defendant and Ms. Barrett moved the Naives to the Shelbyville farm because Mr. Naive had expressed his desire to return to the farm. While at the Shelbyville farm, only the defendant and Ms. Barrett cared for the Naives.

Ms. Barrett testified that, on July 4, the victim came to the Shelbyville farm for a family gathering and that she returned approximately one week later for a visit. Sometime prior to July 16, the defendant received a telephone call that caused him to become very angry. He told Ms. Barrett that the victim's mother-in-law had retained an attorney and that he believed the victim was attempting "to take control" and that she intended to "kick us out of the house." In the week preceding the murder, the victim's son arrived at the Shelbyville farm to take photographs of bruises on Mrs. Naive's face. Ms. Barrett testified that the defendant asked his nephew whether the victim had sent him to take the photographs, and his nephew confirmed that she had.

On July 13, 2010, Ms. Barrett received a voicemail on her cellular telephone that the victim had forwarded to her. The voicemail, which had been left on the victim's cellular telephone, was from the defendant. Although she could not recall the content of the voicemail, Ms. Barrett testified that she recognized the defendant's voice and that the message was "very angry and threatening" and "hateful." She confirmed that if someone had left that voicemail message for her, she would have feared for her safety.

---

[1]Lieutenant Ambrose's investigation revealed that the Naives had four children, but only three - the defendant, the victim, and Thomas B. Naive – were alive at the time the wills were executed in 2007.

Ms. Barrett testified that on the morning of July 16, the defendant left the Shelbyville farm and drove to the Brentwood residence to prepare for the arrival of the Naives because the defendant wanted Ms. Barrett to bring them to the house for the weekend. Between 1:30 and 2:00 in the afternoon, Ms. Barrett drove the Naives to the Brentwood residence and left them in the defendant's care. Sometime later, the defendant contacted her by telephone to tell her that he had "shot [the victim]" and that Ms. Barrett "needed to come back to Brentwood to take care of" the Naives. Ms. Barrett testified that she did not know why the defendant wanted the Naives brought to the Brentwood residence on July 16. She stated that Mrs. Naive loved the Brentwood residence but that Mr. Naive preferred the Shelbyville farm, so she and the victim had discussed transferring the couple back and forth between the residences so that they both could be happy.

John Kieffner, Regions Bank assistant branch manager, testified that he met with the victim on July 14, 2010. He stated that, based on his conversation with the victim, who had arrived for the meeting with a Durable Power of Attorney for Mrs. Naive, he opened a new checking account in the names of the victim and both of her parents. Based on that conversation, he also provided the victim with information on the process for contacting the Regions Bank credit card servicing company to put a stop on a credit card.

Detective James Colvin with the Brentwood Police Department testified that he collected from the Brentwood residence crime scene a five-shot revolver that contained four live rounds and one fired round. The detective also discovered, on a desk in the defendant's bedroom at the Brentwood residence, papers with handwritten notations on criminal offenses "like negligent manslaughter" and other "criminal code type writings." On that same desk, the detective found papers with handwritten notes about reckless endangerment and wrongful death, as well as multiple bulls-eye targets and multiple photocopies of a drawing of a human face. At the Shelbyville farm, Detective Colvin located, in an office area adjacent to what was believed to be the defendant's bedroom, a trash can containing several bulls-eye targets and one drawing of a human face. With respect to the revolver, Detective Colvin testified that he located an empty holster in an open dresser drawer in the defendant's bedroom at the Brentwood residence. The detective confirmed that the dresser was located on the far side of the bedroom from the bedroom door.

Doctor Adele Lewis testified that she performed the autopsy on the victim. She stated that the victim had an entrance wound to the back of the right side of the head and that the bullet exited just below her left eye. She stated that the bullet trajectory followed a slightly downward path, which would indicate that the victim was in a seated position and that the bullet was fired from above her head. Doctor Lewis opined that the cause of death was the gunshot wound to the head and that the manner of death was homicide.

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgment of acquittal and a *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the defendant elected not to testify. The defendant called only one witness, his brother, Thomas Baxter Naive. Thomas Naive testified that he was given power of attorney for both of his parents on July 19, 2010. He stated that he had reviewed all of his parents' financial records and that the defendant had done nothing inappropriate in his handling of his parents' finances.

Based on this evidence, the jury convicted the defendant as charged of first degree premeditated murder. The trial court imposed an automatic sentence of life with the possibility of parole.

Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by denying both his motion to suppress the incriminating statements he provided to law enforcement officers and his motion to suppress his bank records, that the evidence adduced at trial was insufficient to support his conviction, that the trial court erred by allowing the defendant's daughter to testify about a voicemail message left on the victim's telephone, that the trial court erred by not requiring the State's representative to testify first, and that the prosecutor committed misconduct by impermissibly shifting the burden of proof to the defendant during closing argument. We consider each claim in turn.

*I. Motion to Suppress Statements*

The defendant contends that the trial court erred by denying his motion to suppress the inculpatory statements he provided to police, claiming that the statements were made in violation of his constitutional rights. Specifically, the defendant claims that Lieutenant Ambrose's "question first, warn later" technique was designed to elicit incriminating statements from the defendant and that, thus, those statements should be suppressed as violative of his right against self-incrimination.

Lieutenant Ambrose questioned the defendant at the police station shortly after the defendant's arrest on July 16. Lieutenant Ambrose explained that it was his practice to begin interviews with basic, introductory questions before giving *Miranda* warnings. While asking the defendant who was currently living at the Brentwood residence, the defendant responded that he lived there with his parents, and that his "sister, the girl I shot, comes by." Lieutenant Ambrose continued his questioning without addressing this statement. He asked the defendant how long the victim had been staying at the Brentwood residence, to which the defendant responded with a lengthy narrative, concluding with, "So I walked upstairs and killed her." Lieutenant Ambrose then stopped the defendant and issued *Miranda* warnings,

after which the defendant executed a written waiver of his rights and offered a full confession. Following a hearing on the defendant's motion to suppress, the trial court denied the motion, finding that all of the defendant's statements, both pre- and post-*Miranda*, were admissible.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined – a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to

resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-56 (quoting *Kelly*, 603 S.W.2d at 728 (internal citation and quotation marks omitted)).[2]

In *Missouri v. Seibert*, 542 U.S. 600 (2004), a plurality opinion, the Supreme Court examined the police practice of midsteam recitation of *Miranda* warnings after interrogation and after an unwarned confession had been obtained. *Missouri v. Seibert*, 542 U.S. 600 (2004). The interrogating officer in *Seibert* had described the technique she had been taught as follows: "[Q]uestion first, then give the warning, and then repeat the question 'until I get the answer that [the suspect has] already provided once.'" *Seibert*, 542 U.S. at 605-06.

A majority of the Court agreed that this police protocol involving midstream recitation of warnings after interrogation and after an unwarned confession certainly had the potential to circumvent, undermine, and obscure *Miranda*,[3] and a majority voted to suppress Seibert's confession that had been extracted by officers after deliberately issuing *Miranda* warnings midstream.

The majority, however, split four to one regarding how to evaluate whether the two-step interrogation technique could be salvaged so that the warnings could function effectively as *Miranda* envisioned. For the plurality,

> [t]he threshold issue when interrogators question first and warn later is . . . whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as

---

[2]This test is exactly the same as that promulgated in *Rogers v. Richmond*, 365 U.S. 534, 544 (1961), so it is not entirely clear that it actually effectuates the stated goal of providing more protection to the criminally accused.

[3]The Court articulated the potential in the following fashion:

> By any objective measure, . . . it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content. . . . Thus, when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran v. Burbine*, 475 U.S. 412, 424 (1986).

*Seibert*, 542 U.S. at 613-14.

> *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier?

*Id.* at 611-12.

The plurality viewed the answer to that question as dependent on five factors: (1) "the completeness and detail of the questions and answers in the first round of interrogation," (2) "the overlapping content of the two statements," (3) "the timing and setting of the first and the second," (4) "the continuity of police personnel," and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615. Examining those factors, the plurality concluded that the midstream warnings given to Seibert did not adequately convey to her that she retained a choice about continuing to talk. *See id.* at 616-17.

Justice Kennedy concurred in the result, adding the fifth vote for suppression, but he rejected the plurality's multi-factor test as "cut[ting] too broadly." *Id.* at 622 (Kennedy, J., concurring). He espoused what he termed "a narrower test" that when the two-step interrogation is "used in a calculated way," postwarning statements "must be excluded unless curative measures are taken before the postwarning statement is made." *Id.* (Kennedy, J., concurring). An example of curative measures is "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning," which allows the suspect to distinguish the two contexts and realize "that the interrogation has taken a new turn." *Id.* (Kennedy, J., concurring). An additional warning may suffice if it "explains the likely inadmissibility of the prewarning custodial statement." *Id.* (Kennedy, J., concurring).

The Tennessee Supreme Court first interpreted *Seibert* in *State v. Northern*, 262 S.W.3d 741 (Tenn. 2008). In *Northern*, the defendant was arrested on drug charges and transported to the police station, where he was seated in the middle of the "Murder Squad Office," surrounded by detectives. *State v. Northern*, 262 S.W.3d 741, 745 (Tenn. 2008). The detectives began discussing a murder they suspected the defendant had committed. *Id.* "In general, the conversation minimized the shooter's responsibility and implied that the victim assumed the risk of being murdered when he drove late at night into a neighborhood notorious for crime." *Id.* After listening to this conversation for approximately twenty minutes, the defendant suddenly announced that he was present at the shooting. *Id.* One of the detectives then moved the defendant to an interview room equipped with a video camera and issued *Miranda* warnings. *Id.* The defendant executed a written waiver of his rights, and the detective proceeded to interrogate the defendant about the murder, to which the defendant "readily confessed." *Id.*

The court held that the conversation among the detectives in the presence of the defendant "amounted to the functional equivalent of express questioning," which required analysis under *Seibert*. *Id.* at 753. After examining the many opinions in *Seibert*, the court concluded it need not "attempt to foretell which, if any, of the *Seibert* approaches will eventually garner the majority of the justices of the United States Supreme Court" because under any approach, the defendant's post-*Miranda* confession was admissible. *Id.* at 760.

The court again conducted a *Seibert* analysis in *State v. Dailey*, 273 S.W.3d 94 (2009). In *Dailey*, law enforcement officers suspected the defendant's involvement in a murder, and they asked the defendant to come to the police station under the pretense of needing a second fingerprint analysis, although the actual reason for the invitation was to interview the defendant. *State v. Dailey*, 273 S.W.3d 94, 97 (2009). Detectives subjected the defendant, who was not in custody, to intense, pointed questioning for approximately 20 minutes, indicating that they had evidence implicating him in the murder and urging him to confess. *Id.* at 97-99. The defendant eventually did confess to the crime, at which time the detectives provided *Miranda* warnings. *Id.* at 99-100. The defendant executed a written waiver of his rights and proceeded to reiterate his confession, adding a few minor details to the original confession. *Id.* at 100. The supreme court held that, under either the five-factor test employed by the *Seibert* plurality or the narrower test preferred by Justice Kennedy, both the defendant's pre- and post-*Miranda* confessions were inadmissible "because his initial statement was taken in violation of his Fifth Amendment right against self-incrimination, and the tardy *Miranda* warnings did not function effectively so as to render his second statement admissible." *Id.* at 110.

Both the *Dailey* and *Northern* courts continued their analysis under the Tennessee Constitution. *See Dailey*, 273 S.W.3d at 110; *Northern*, 262 S.W.2d at 763. The effect of the defendant's initial unwarned incriminating statement on the later waiver of *Miranda* rights is reviewed pursuant to the guidelines set forth in *State v. Smith*, 834 S.W.2d 915 (Tenn. 1992). In *Smith*, the Tennessee Supreme Court held on state constitutional grounds,

> [E]xtraction of an illegal, unwarned confession from a defendant raises a rebuttable presumption that a subsequent confession, even if preceded by proper *Miranda* warnings, is tainted by the initial illegality. That presumption may be overcome by the prosecution, however, if the State can establish "that the taint is so attenuated as to justify admission of the subsequent confession."

*Id.* at 919 (quoting *Oregon v. Elstad*, 470 U.S. 298, 335 (Brennan, J., dissenting)).

The supreme court identified as the central inquiry "whether the events and circumstances surrounding and following the initial, illegal conduct of law enforcement officers prevented the accused from subsequently (1) making a free and informed choice to waive the State constitutional right not to provide evidence against one's self, and (2) voluntarily confessing . . . involvement in the crime." *Smith*, 834 S.W.2d at 919. To address the inquiry, the supreme court directed courts to examine the following factors:

> 1. The use of coercive tactics to obtain the initial, illegal confession and the causal connection between the illegal conduct and the challenged, subsequent confession;
>
> 2. The temporal proximity of the prior and subsequent confessions;
>
> 3. The reading and explanation of *Miranda* rights to the defendant before the subsequent confession;
>
> 4. The circumstances occurring after the arrest and continuing up until the making of the subsequent confession including, but not limited to, the length of the detention and the deprivation of food, rest, and bathroom facilities;
>
> 5. The coerciveness of the atmosphere in which any questioning took place including, but not limited to, the place where the questioning occurred, the identity of the interrogators, the form of the questions, and the repeated or prolonged nature of the questioning;
>
> 6. The presence of intervening factors including, but not limited to, consultations with counsel or family members, or the opportunity to consult with counsel, if desired;
>
> 7. The psychological effect of having already confessed, and whether the defendant was advised that the prior confession may not be admissible at trial;
>
> 8. Whether the defendant initiated the conversation that led to the subsequent confession; and
>
> 9. The defendant's sobriety, education, intelligence level, and

experience with the law, as such factors relate to the defendant's ability to understand the administered *Miranda* rights.

*Id.* at 919-20. The court cautioned that no single factor is determinative; instead, "a court must examine the totality of the circumstances surrounding the two confessions to determine whether the subsequent confession by the defendant can truly be termed a knowing and voluntary statement." *Id.* at 920; *see Dailey*, 273 S.W.3d at 110-11. The court in *Northern* recognized the similarities between the *Smith* factors and the five-factor analysis utilized by the *Seibert* plurality. *Northern*, 262 S.W.3d at 765.

In the instant case, once the defendant made the statement that he "walked upstairs and killed" the victim, Lieutenant Ambrose stopped the defendant and informed him that "this is at the point in time where I have to read you your rights," to which the defendant responded, "Yes, sir, I understand." The interview continued as follows:

Ambrose: Ok, what I'm gonna do is I'm gonna read them to you. I'm gonna give you a piece of paper here and I want you to follow along as I read them to you. If you have a question, I want you to say I have a question, can you answer it for me. Something like that ok. Can you tell me how far you got to school?

Defendant: Me?

Ambrose: Yeah.

Defendant: College education, associate's degree in civil engineering technology from Columbia State University. I went to MTSU and to UT Nashville.

Ambrose: Ok, I need to ask this question, have you had anything to drink today any alcohol, or are you taking (inaudible)?

Defendant: I take my blood pressure medicine and that.

Ambrose: Any pain medicine or anything like that you took?

Defendant: I took lortab, it's all prescribed by the VA. My

-15-

card is in my billfold.

Ambrose: When they're talking about a drug, they are talking about marijuana, cocaine or anything like that. Ok. Here is the sheet of paper and we're going to go over it and start from up here then we will go down to this paragraph ok? Says before I ask you any questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You understand that?

Defendant: Yes.

Ambrose: Ok, you have the right to talk to a lawyer for advice before we ask you any questions and have with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. You understand those things?

Defendant: Yes.

Ambrose: Oh, in the paragraph here, it says, if you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to stop answering at any time if you need to talk to a lawyer. You understand that?

Defendant: Yes sir.

Ambrose: Now the next paragraph right here says waiver of rights. It says, I have read this statement of my rights and I understand what my rights are. I want to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind have been used against me.

-16-

You understand what coercion means?

Defendant: Yes sir.

Ambrose: Ok. Alright now, with all those rights in mind are you willing to talk to me now?

Defendant: I'd really like to talk to you but if I sign that it says whatever I say can be held against me and I really, yeah I will talk to you.

Ambrose: I need you to sign right here on the x for me. Like you would sign a paycheck. And bear in mind anytime you want to stop answering just say I want to stop answering.

Defendant: Here is what bothers me. I do not want a lawyer. I do not necessarily have to have one at this time and I don't mind talking to you, but I do need a lawyer at some point.

Ambrose: Well, eventually it may lead to that. I can't say that. Right now what I'm trying do is find out what happened today in your opinion.

Defendant: But this doesn't mean if I sign this, does this mean they will not appoint me a lawyer?

Ambrose: No, it does not. That just says, that you understand rights.

Defendant: That I can talk to you now without one.

Ambrose: Right.

Defendant: We ain't gotta wait.

Ambrose: No, it also means, also Mr. Naive that at some point in time you feel like you don't want to talk to me anymore, you can just say, I really don't

want to talk to you anymore. Something like that. You understand that? It means you're free to stop answering and stop talking to me anytime you want to ok.

Defendant:     (inaudible)

Ambrose:       Alright, are you ok now to talk? Let's start with today.

Following the defendant's hearing on his motion to suppress both his pre- and post-*Miranda* statements, the trial court made the following ruling:

The Court now has carefully considered the motion. And relying on the testimony produced at that hearing, particularly the testimony of Lieutenant Ambrose, and after having now carefully considered the video of the statement which was entered as an exhibit, the Court is not convinced that the prewarning questioning performed by Lieutenant Ambrose fits into the definition of an interrogation which seems to be required for a question first, warn later analysis.

To the extent the statements made by the defendant to Lieutenant Ambrose would fit the question first, warn later analysis, this Court is satisfied that the factors established by the United States Supreme Court in a case of [*Missouri v. Seibert*, 542 U.S. 600 (2004)] and cited by the Tennessee Supreme Court in the case of [*State v. Dailey*, 273 S.W.3d 94 (Tenn. 2009)], these factors weigh against the defendant and do not support a finding that his statements to Lieutenant Ambrose are worthy of suppression.

And simply comparing the facts as to the police conduct in both the Seibert and the Daily [sic] case to the conduct of the Brentwood Police Department in this case, the Brentwood Police conducted – or statement conducted through Lieutenant Ambrose was remarkably different. Simply put, Lieutenant Ambrose did not elicit a confession from [the defendant] before Lieutenant Ambrose gave [the defendant] his Miranda warnings.

True enough [the defendant] gave incriminating statements despite Lieutenant Ambrose's best efforts to stop him pre-Miranda, but these statements were not in response to accusatory interrogation by the Lieutenant. They were simply voluntary statements made by the defendant. The questions asked by Lieutenant Ambrose pre-Miranda were simply seeking perfunctory, harmless booking information and information gathering, administrative concerns regarding the defendant. These questions were not reasonably, likely to invoke incriminating response. In this process Lieutenant Ambrose did nothing to undermine the Miranda warnings.

In comparing the Seibert factors to the defendant's statements in this case, this Court finds that the defendant was in custody, obviously, at the time he made the statements to Lieutenant Ambrose. However, the next finding is that there were – there was no first round of questioning by Lieutenant Ambrose and, thus, no questioning to overlap into a second round of questioning.

The timing of the questions which were accusatory in nature all took place post-Miranda in the same room as the defendant's voluntary confession. Both statements were made to the same officer, Lieutenant Ambrose, but he only conducted one interview which was post-Miranda. None of the statements made by the defendant either post or pre-Miranda were coerced and no coercive tactics were employed by Lieutenant Ambrose. All the statements made by the defendant were freely and voluntarily given by the defendant.

The post-Miranda statements the Court finds were made by the defendant who fully understood his Miranda rights and voluntarily waived his Miranda protections. The Defendant's sobriety, intelligence level all indicate that he knew what he was doing when he gave the post-Miranda statements. Therefore, the defendant's motion to suppress the statements is denied.

With respect to the defendant's pre-*Miranda* statement, we hold that the trial court erred by finding that it did not qualify as an interrogation and was thus admissible. *See Miranda v. Arizona*, 384 U.S. 436, 444 (defining "custodial interrogation" as "questioning

initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way"). As found by the trial court, the defendant was in police custody, and Lieutenant Ambrose was questioning him when the defendant offered the two unsolicited confessions. Because these two statements were made prior to the provision of the *Miranda* warnings, they required suppression. In light of the defendant's admissions of guilt prior to his arrest, and his full post-*Miranda* confession, which, as we discuss below, was properly admitted at trial, we hold that the admission of the pre-*Miranda* confessions was harmless beyond a reasonable doubt. *See Arizona v. Fulminante*, 499 U.S. 279, 295 (1991) (applying harmless error analysis to coerced confessions if the court determines the error is harmless beyond a reasonable doubt); *Chapman v. California*, 386 U.S. 18, 24 (1967).

With respect to the defendant's post-*Miranda* confession, we find the trial court's reasoning sound. Without question, the defendant's statement to Lieutenant Ambrose was voluntary. Indeed, during the reading of the *Miranda* warnings, the defendant told Lieutenant Ambrose, in no uncertain terms, that he wished to talk to him. There is no evidence that Lieutenant Ambrose, in any way, coerced a confession from the defendant. Prior to the defendant's arrival at the police station, he had already voluntarily confessed his crime to the 9-1-1 operator, his daughter, and both Officer Twiford and Officer Benson. During the pre-*Miranda* questioning, both of the defendant's statements about shooting or killing the victim were completely spontaneous and non-responsive to Lieutenant Ambrose's questions. The pre-*Miranda* portion of the interview lasted approximately ten minutes and provided little detail about the crime itself, whereas the detailed, post-*Miranda* interview lasted more than one hour and 15 minutes. The lieutenant's reading and explanation of the defendant's *Miranda* rights was certainly adequate, and, in examining the circumstances surrounding the confession, no evidence suggests that the detention was particularly lengthy or that the defendant was deprived of any basic needs. The defendant was sober, and his education and intelligence level adequately conveyed that he understood his rights and knowingly waived them.

Although there was no break or lapse in time between the so-called first and second interviews, and although the police personnel was the same throughout, we do not believe these factors outweigh the utter and complete voluntariness of the defendant's post-warning confession. Simply put, Lieutenant Ambrose's pre-*Miranda* questions were not designed to elicit a confession. In examining the totality of the circumstances, we conclude that the defendant knowingly and voluntarily waived his right against self-incrimination prior to giving his full, post-*Miranda* confession. The prosecution successfully rebutted the presumption that the unwarned, incriminating admission tainted the subsequent confession given by the defendant. As a result, that second statement was properly admitted at trial.

The defendant also sought suppression of the items seized from both the Brentwood residence and the Shelbyville farm, on the basis that he gave his consent during his illegally-obtained confession. Because we have held that the defendant's post-*Miranda* confession was admissible, no basis exists for suppression of the items seized in the search of the two properties.

## II. Motion to Suppress Bank Records

The defendant next contends that the trial court erred by denying his motion to suppress his bank records, which were obtained by the State via a judicial subpoena served upon Regions Bank. No subpoena was served upon the defendant, and the defendant argues that this failure violated the Financial Records Privacy Act ("the Act"). *See* T.C.A. §§ 45-10-101 to -118 (2007). The Act provides, in pertinent part, that "[a] subpoena authorizing the production of financial records may be served upon a financial institution only if: . . . in any judicial proceeding in which the customer is a named party, a copy of the subpoena has been served on the customer." T.C.A. § 45-10-106.

The terms of this statute, however, do not provide suppression as a penalty for non-compliance. *See State v. M. Dale Lowe*, No. 89-92-III, slip op. at 19 (Tenn. Crim. App., Nashville, Nov. 15, 1990), *perm. app. denied* (Tenn. Feb. 11, 1991) (stating that the Act "is directed to financial institutions" and "contains no penalty for its violation and certainly does not prohibit the introduction of evidence contained without compliance with the Act at a sentencing hearing in a criminal case"). Given the overwhelming proof in the record of the defendant's guilt, his brother's testimony that the defendant had done nothing inappropriate in the handling of their parents' finances, and the fact that the State did not utilize the bank records, any error would be considered harmless. As such, the defendant is not entitled to relief on this issue.

## III. Sufficiency of Evidence

The defendant contends that the evidence is insufficient to support his conviction of first degree murder. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379

(Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202 (2006). As used in the statute,

> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d).

Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007); *see also State v. Johnny Wright*, No. 01C01-9503-CC-00093 (Tenn. Crim. App., Nashville, Jan. 5, 1996) (citing LaFave and Scott, *Substantive Criminal Law* § 7.7 (2d ed. 1986)). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g., State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

Here, the proof adduced at trial established that the defendant was angry with

the victim over her alleged plans to have the defendant's family removed from the Shelbyville farm. The defendant told Lieutenant Ambrose that he was aware of the victim's visit to Regions Bank in the days before the murder and that he believed the victim intended to "interfere" with the defendant's plans for his parents. The defendant's daughter, Ms. Barrett, testified about the "angry," "threatening," and "hateful" voicemail the defendant left on the victim's cellular telephone, a voicemail that Ms. Barrett testified would have made her fear for her safety had it been left for her. Law enforcement officers found bulls-eye targets at both the Brentwood residence and the Shelbyville farm, as well as a hand-drawn picture of a human face riddled with bullet holes. All of these items were found in either the defendant's bedroom or an office adjacent to his bedroom. Officers also found handwritten notes referencing manslaughter, wrongful death, and reckless endangerment, some of which, according to the defendant's statements to Lieutenant Ambrose, were written at the Brentwood residence just hours before the murder.

Just prior to the murder, the victim and the defendant were involved in a verbal altercation over the care of their parents, prompting Mr. Naive to begin screaming, at which point the defendant left the living room, walked upstairs to his bedroom, retrieved a handgun from a dresser drawer on the far side of the bedroom, walked back downstairs to the living room, and shot the unarmed victim in the back of the head. Immediately following the murder, the defendant placed the handgun on a chair and called 9-1-1 to report that he had shot the victim. He then called Ms. Barrett to tell her what had transpired and requested that she come to the Brentwood residence to care for his parents. When law enforcement officers arrived on the scene, the defendant was "strangely calm," "relaxed," and "seemed at peace with the situation." The defendant admitted to shooting the victim to no less than five people in the hours following the murder. Doctor Lewis testified that the victim suffered a gunshot wound to the head and that the manner of her death was homicide.

Affording the State the strongest legitimate view of the evidence and deferring to the credibility determinations made by the jury, we conclude that the evidence overwhelmingly supports the defendant's conviction of first degree premeditated murder.

*IV. Voicemail Evidence*

The defendant next contends that the trial court erred by permitting Ms. Barrett to testify about a voicemail allegedly left by the defendant on the victim's cellular telephone. At trial, the defendant objected to the introduction of Ms. Barrett's testimony regarding the voicemail, and the trial court conducted a hearing outside the presence of the jury. Ms. Barrett testified that on approximately July 13, 2010, the victim forwarded to Ms. Barrett's cellular telephone a voicemail left on the victim's own cellular telephone. Ms. Barrett recognized the voice to be that of her father, the defendant, and she stated that although she

could not recall exactly what the defendant said in the voicemail message, she testified that the voicemail was "real hateful, and angry and threatening." She opined that if that same message had been intended for her, she would have been concerned for her safety. The trial court ruled that the probative value of Ms. Barrett's testimony regarding the voicemail outweighed any prejudicial effect and that, furthermore, the defense could cure any potential prejudice through cross-examination. In addition, the trial court found that Ms. Barrett's testimony was proper opinion testimony, based on her familiarity with both the defendant and his voice.

On appeal, the defendant advances several arguments in support of his assignment of error. First, the defendant argues that Ms. Barrett's testimony was improper under Tennessee Rule of Evidence 1002, the "best evidence" rule. Rule 1002 provides, in pertinent part, that, "[t]o prove the content of a . . . recording . . ., the original . . . recording . . . is required, except as otherwise provided in these rules." The defendant did not make this argument before the trial court, however, and "[i]ssues raised for the first time on appeal are considered waived." *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996).

Next, the defendant contends that Ms. Barrett's testimony about the voicemail was improper lay opinion. Lay witnesses may give testimony in the form of an opinion where the testimony is "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). We see no abuse of discretion in the trial court's decision to allow the testimony under Rule 701 based on Ms. Barrett's familiarity with both the defendant and his voice.

The crux of the defendant's argument against the admission of the voicemail testimony hinges on relevancy. He argues that the voicemail evidence is irrelevant, and even if relevant, that its probative value is outweighed by its prejudicial effect.

Questions concerning evidentiary relevance rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

Relevant evidence is evidence "having any tendency to make the existence of

any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may still be excluded "if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

We see no abuse of discretion in the trial court's decision to allow the testimony of Ms. Barrett concerning the voicemail. The trial court specifically found that the probative value of Ms. Barrett's testimony outweighed its prejudical impact. The fact that Ms. Barrett was unable to recall exactly what the defendant said in the voicemail message does not render her testimony irrelevant; rather, it creates a question as to the weight of the evidence and not its admissibility, and defense counsel was able to sufficiently cross-examine Ms. Barrett on her lack of recollection.

The defendant also contends that the admission of the voicemail testimony was improper under Tennessee Rule of Evidence 404, which provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." The rationale underlying the general rule is that admission of such evidence carries with it the inherent risk of the jury's convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than upon the strength of the evidence. *State v. Thacker*, 164 S.W.3d 208, 239 (Tenn. 2005).

Notwithstanding the general rule, evidence of a defendant's prior crimes, wrongs, or acts may be admissible where it is probative of material issues other than conduct conforming with a character trait. Tenn. R. Evid. 404(b). Thus, evidence of a defendant's character may become admissible when it logically tends to prove material issues which fall into one of three categories: (1) the use of "motive and common scheme or plan" to establish identity; (2) to establish the defendant's intent in committing the offense at trial; and (3) to "rebut a claim of mistake or accident if asserted as a defense." *Thacker*, 164 S.W.3d at 239 (citing *State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996)). To admit such evidence, the rule specifies three prerequisites:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the

reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admission is that the court must find by clear and convincing evidence that the defendant committed the other crime. *Id.*, Advisory Commission Cmm'n.; *DuBose*, 953 S.W.2d at 654; *State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985).

In reviewing a trial court's decision to admit or exclude evidence under Rule 404, an appellate court may disturb the trial court's ruling only if there has been an abuse of discretion. *Thacker*, 164 S.W.3d at 240. The trial court's determination is entitled to deference when it has substantially complied with the procedural requisites of Rule 404(b). *See DuBose*, 953 S.W.2d at 652. If, however, the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *See id.*

In the instant case, the trial court did conduct a hearing outside the presence of the jury and did determine that the probative value of the voicemail testimony outweighed the danger of unfair prejudice. However, the trial court failed to specifically make the requisite findings of material issue and clear and convincing evidence. Accordingly, we review the trial court's decision to admit the voicemail evidence de novo without any deference to the decision.

Pursuant to our de novo review, we conclude that the trial court correctly ruled that the voicemail testimony was admissible under Rule 404(b). The fact that the defendant left a threatening voicemail for the victim a few days prior to murdering her goes to the material issue of intent, which is an element of the charged offense of premeditated murder. *See Thacker*, 164 S.W.3d at 239. Ms. Barrett's testimony established by clear and convincing evidence, that the defendant left a hateful and threatening voicemail for the victim. Finally, we find, as did the trial court, that the highly probative value of this evidence was not outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 404(b)(3). Accordingly, the admission of the voicemail testimony was not error.

### V. State's Designated Representative

Next, the defendant argues that the trial court erred by failing to require Lieutenant Ambrose to testify first as the State's designated representative.

-26-

Rule 615 of the Tennessee Rules of Evidence governs the exclusion of witnesses during a trial or hearing:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

Tenn. R. Evid. 615. This rule permits "the prosecuting attorney [to] designate a crime victim, a relative of a crime victim, or an investigating officer" to remain in the courtroom and even at counsel table. *See id.*, Advisory Comm'n Cmts. "The trial court may, as a sanction, exclude the testimony of a witness who hears other testimony while subject to a sequestration order." *State v. Black*, 75 S.W.3d 422, 424 (Tenn. Crim. App. 2001). "The decision to exclude or allow the testimony is a matter within the discretion of the trial court, subject to a showing of abuse *and prejudice to the complaining party*." *Id.* at 424-25 (emphasis added).

Rule 615 essentially replaced Tennessee Code Annotated section 24-1-204, which excluded parties to the suit from the rule of sequestration of witnesses and which was repealed in 1991. *See* T.C.A. § 24-1-204 (2000) (repealed Acts 1991, ch. 273, §§ 8, 9); *see also Black*, 75 S.W.3d at 425. With the statutory exemption in place, the Tennessee Supreme Court had said, "The court should impose as a condition that the State, if it desires to use the prosecutor as a witness, should examine him first." *Smartt v. State*, 80 S.W. 586, 588 (Tenn. 1904). The Court of Criminal Appeals has said, "We do not believe that Rule 615 affects *Smartt*'s requirement that the state's designated person testify first." *State v. Timmy Reagan*, No. M2002-01472-CCA-R3-CD, slip op. at 18 (Tenn. Crim. App., Nashville, May 19, 2004). That said, the *Timmy Reagan* court recognized an exception in the case of expert witnesses, *see id.,* slip op. at 18; *State v. Bane*, 57 S.W.3d 411, 423 (Tenn. 2001), and more significantly, that court applied the rule that the party aggrieved by the designated witness's

deferred testimony must show prejudice via the designated witness's "improperly changing his testimony while hearing other witnesses testify," *Timmy Reagan*, slip op. at 18; *see State v. Sexton*, 724 S.W.2d 371, 374 (Tenn. Crim. App. 1986) (holding that "[w]hile it would have been the better practice for the prosecuting witness . . . to have testified first, such failure to do so did not substantially injure the plaintiff"); *Mothershed v. State*, 578 S.W.2d 96, 100-01 (Tenn. Crim. App. 1978).

In the present case, the defendant filed a motion in limine asking the trial court to require the State's designated representative to testify first. The trial court denied the defendant's motion and permitted Lieutenant Ambrose, as the State's representative, to sit at counsel table even though he was the third witness to testify. Nothing in the record indicates that Lieutenant Ambrose changed his testimony after hearing the testimony of the two Brentwood Police Department officers who responded to the crime scene. The defendant has offered no proof that he was in any way prejudiced by Lieutenant Ambrose's failure to testify first. Although, as this court has previously noted, it might have been best if Lieutenant Ambrose had been the first to testify, *see Sexton*, 724 S.W.2d at 374, the order of testimony in the present case did not prejudice the defendant, and as such, we hold that no abuse of discretion occurred.

## VI. *Prosecutorial Misconduct*

Finally, the defendant argues that the prosecutor committed misconduct during closing argument by impermissibly shifting the burden of proof to the defense. Defense counsel, in his closing argument, posited that the defendant had "never left Vietnam" and suggested to the jury that the defendant's alleged diagnosis of post traumatic stress disorder caused him to shoot the victim. In her rebuttal, the prosecutor stated the following:

> Shot her in the back of the head, she was sitting and I shot her in the back of the head. Now the defense wants to say he never left Vietnam, he has Post Traumatic Stress Disorder. The only reason you know about that is because of what he told Lieutenant Ambrose, but even in his own words he said, I'm not blaming what I've done on that. The defense chose to put on one witness, ask them all of three questions. Now granted the burden is on us.

At that point, defense counsel objected to the prosecutor's "shifting the burden to the defense," to which the prosecutor responded that she had "specifically stated the burden is on us" and that she is "allowed to comment on the evidence." The trial court overruled the defendant's objection. The prosecutor then continued by stating, "The burden is on the State,

however, they have the same subpoena power that we do." The defense again objected, and the trial court conducted a bench conference outside the presence of the jury. The following exchange occurred:

| | |
|---|---|
| Trial Court: | What is your objection? |
| Defense Counsel: | Objecting for us failing to call witnesses? |
| Trial Court: | I'm not used to attorney's objecting in closing arguments. It's very unusual. Please stick to your burden of proof. |
| Prosecutor: | Yes, Judge. |
| Trial Court: | And let's not be objecting to anything else. |
| Prosecutor: | Your Honor, just for clarification I'm allowed to talk about what's not presented; correct? |
| Trial Court: | Argue your case. |

The prosecutor then continued her argument:

> Did you hear from a doctor, did you hear from a counselor, did you see medical records, no, you did not. There is no jury instruction that he suffers from some type of mental disease or defect so that he doesn't understand what he's doing. So ladies and gentlemen, I'm going to submit to you to just ignore that because I would submit to you that that's a smoke screen, a smoke screen to get you to feel sorry and have empathy for this war veteran. Yes he was in Vietnam, but does the fact that he served his country 40 years ago diminish what he did to his sister on July 16th of 2010, no, it does not. It does not diminish the fact.

Despite the discretion afforded trial courts in determining the propriety of closing argument, judges must nevertheless take care to restrict improper argument. *State v. Hill*, 333 S.W.3d 106, 130-131 (Tenn. Crim. App. 2010) (citing *Sparks v. State*, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978)). Because of the State's unique role in a

criminal case, the State, in particular, "must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." *Hill*, 333 S.W.3d at 131. We have consistently held that closing argument for both parties "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" *Id.* (quoting *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). Even inappropriate closing argument will not warrant a new trial unless it was so inflammatory or improper as to affect the verdict. *Hill*, 333 S.W.2d at 131 (quoting *Harrington v. State*, 385 S.W.2d 758, 759 (1965)). An appellate court considering the propriety of closing argument examines the following factors:

> (1) The conduct complained of viewed in the context and in light of the facts and circumstances of the case[;]
> (2) [t]he curative measures undertaken by the court and the prosecution[;]
> (3) [t]he intent of the prosecutor in making the improper statements[;]
> (4) [t]he cumulative effect of the improper conduct and any other errors in the record [; and]
> (5) [t]he relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

Applying these factors to the instant case, we note that, in viewing the conduct of the prosecutor in the context of the closing arguments, defense counsel raised the issue of post traumatic stress disorder for the first time in his closing argument, and the prosecutor was merely responding to that issue in her rebuttal argument. With respect to curative measures, the trial court simply instructed the prosecutor to "stick to [her] burden of proof," but the prosecutor did continue her argument by referencing the evidence the defense did *not* present: "Did you hear from a doctor, did you hear from a counselor, did you see medical records, no, you did not." The third factor, that of the prosecutor's intent, weighs in favor of the State. We discern no malice in the prosecutor's statements. Rather, she was merely responding to defense counsel's argument. The cumulative effect of the conduct was fleeting; the prosecutor referenced the fact that the defense only called one witness, that the defense "has the same subpoena power" as the State, and that the defense failed to call any sort of expert witness to offer proof of the defendant's post traumatic stress disorder. Finally, when viewing the prosecutor's conduct in rebuttal argument against the strength of the case, we conclude that the evidence against the defendant was extremely strong and that the issue forming the basis of the defendant's complaint was not a central part of the defense.

Taking all of these factors together, we hold that the argument, if improper, did

not likely affect the outcome of the trial.  Accordingly, any error was harmless.

## *VII.  Conclusion*

The trial court properly denied both the defendant's motion to suppress his post-*Miranda* statement to law enforcement and his motion to suppress his bank records. Although the trial court erred by admitting the defendant's pre-*Miranda* statement to law enforcement, the error is harmless beyond a reasonable doubt.  The evidence is sufficient to support the defendant's conviction.  The trial court did not err by admitting the voicemail testimony or by failing to require the State's representative to testify first.  The prosecutor's statements during closing argument do not amount to reversible error.  Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE